**TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Plaintiff,**

v.

**ORMESA GEOTHERMAL, A general partnership; Ormat Engineering, Inc.; Ormat Geothermal, Inc.; and LFC No. 25 Corp., Defendants.**

**No. 87 CV 1259 (KMW).**

United States District Court, S.D. New York.

Oct. 16, 1991.

Fried, Frank, Harris, Shriver & Jacobson (Robert E. Gerber, Heidi E. Schallenberg, of counsel), New York City, for plaintiff.

Milgrim, Thomajan & Lee P.C. (Robert A. Meister, Lucy Prashker, Carol M. Fischer, of counsel), New York City, for defendants.

## AMENDED OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Teachers Insurance and Annuity Association of America ("TIAA" or "Teachers"), a New York corporation that is an institutional lender, brought this action against a prospective borrower alleging breach of a commitment letter agreement that "circled" a "blended" interest rate of 10.64% for a twenty-year loan of $25,000,000. After a sharp decline in interest rates rendered the agreement less advantageous to the borrower, the borrower took a negotiating stance allegedly designed to alter or scuttle the transaction, and finally refused to continue negotiating with TIAA, claim-

ing that TIAA had "walked" from the deal. Plaintiff and defendant Ormesa each seek damages for breach of contract.

After a fifteen-day trial, during which the court heard the testimony of the principal actors in the negotiation, among others, and having evaluated the witnesses' credibility, the exhibits received in evidence, including notes of meetings and telephone calls, and the parties' legal contentions, the court finds that plaintiff is entitled to judgment in its favor, and finds that defendant Ormesa has failed to sustain its burden of proof on its counterclaim.

## I. *Liability*

### A. *Background and Origins of the Transaction*

Defendant Ormesa Geothermal ("Ormesa") is a general partnership formed under the laws of California to construct a geothermal power plant in the Imperial Valley of California (the "Project"). During the time of the events in controversy, its general partners were Ormat Engineering, Inc.; Ormat Geothermal, Inc.; and LFC No. 25 Corp. Ormat Engineering and Ormat Geothermal are subsidiaries of Ormat, Inc., which in turn is a subsidiary of Ormat Turbines, Ltd., an Israeli corporation whose principal place of business is in Israel. The principal officers of the Ormat partners in Ormesa are Mr. Lucien Bronicki and Mrs. Dita Bronicki, citizens of Israel residing in Israel, and Mr. Hezy Ram, a citizen of Israel with residences in Israel and the United States. The third general partner of Ormesa is LFC No. 25 Corp. ("LFC"), a special purpose corporation formed for the purpose of implementing the Project; LFC's principal officer was James Porter. Ormesa was represented in connection with the Project by the Washington, D.C. and Seattle, Washington offices of the law firm of Perkins Coie. Robert Giles was the partner from Perkins Coie's Seattle office with the principal responsibility for its services in connection with the Project.

The financing arrangements for the Project were complex. The Project contemplated the placement of three types of debt financings and the contribution of equity funding. With respect to the debt, the Project needed approximately $50,000,000 of interim or "construction" financing (the "Construction Loan") for the period during which the Project would be constructed. It then needed approximately $50,000,000 of long-term financing (the "Long-term Loan") to replace the Construction Loan when construction was completed. The Construction Loan and the Long-term Loan were to be 90% guaranteed by the United States Department of Energy (the "DOE"). At the time TIAA was negotiating the transaction at issue in this litigation (the "Transaction") with Ormesa the Long-term Loan was to have been 90% guaranteed by the DOE, and the Loan was to have been made through the issuance of two sets of notes, with the unguaranteed notes at a higher rate of interest. In addition to the Construction Loan and the Long-term Loan, the Project also needed approximately $10,000,000 of subordinated financing (the "Subordinated Loan"), to be funded at the time the Construction Loan closed. It would also require the equity contribution of LFC (the "Equity Contribution") at the time of the closing of the Construction Loan.

The construction lender on the Project was Bankers Trust Company ("Bankers Trust"). The Bankers Trust officer with principal day-to-day responsibility for the Construction Loan on the Project was Donald Carse. Bankers Trust's counsel was the New York office of O'Melveny & Myers ("O'Melveny"). As a condition to closing its Construction Loan, Bankers Trust desired a "takeout" commitment by a long-term lender, to provide the Long-term Loan to repay and thus replace or "take out" the Construction Loan. The collateral for the Construction Loan would also secure the Long-term Loan after it replaced the Construction Loan. Therefore, documents with respect to the Long-term Loan were drafted and negotiated concurrently with those relating to the Construction Loan and the Subordinated Loan.

### B. *Ormesa's Search for Long-term Financing; the Commitment Agreement*

In the fall of 1985, Ormesa retained E.F. Hutton as its agent for the purpose of

obtaining the Long-term Loan for the Project. The E.F. Hutton employees with principal day-to-day responsibility for the Transaction were Vince Castellano, and, after Castellano's departure from E.F. Hutton in August 1986, Gerald Gminski. At all times relevant to this litigation, E.F. Hutton was Ormesa's agent with respect to its dealings with TIAA and John Hancock.

After E.F. Hutton was retained, Castellano contacted over twenty prospective lenders, seeking to interest them in providing the desired Long-term Loan for the Project. When Castellano solicited prospective lenders, he was frequently questioned concerning the DOE's long-term guaranty (the "Long-term Guaranty"). The Long-term Guaranty was likely to be important to prospective lenders, because 90% of the Long-term Loan was to be guaranteed by the DOE. Because of the importance of the Long-term Guaranty, Castellano obtained from the DOE a form of guaranty and, in discussions with the DOE, assured himself that he was aware of all of the terms and conditions of the Long-term Guaranty, and that the regulations that had been provided to him were authoritative.

Among the prospective lenders contacted by Castellano were TIAA and John Hancock Mutual Life Insurance Company ("John Hancock"), an insurance company that invests, *inter alia*, in debt securities obtained in private placements. Because the Ormesa loan was highly complex, requiring negotiation with several entities including the DOE, and because it required fixing the interest rate far in advance of funding, only sophisticated institutional lenders were likely to (and did) show serious interest in the transaction. For these reasons, Ormesa had to increase the interest rate from that contained in its original offer in order to interest investors. In late January 1986, TIAA and John Hancock each expressed a willingness to provide 50% (or approximately $25,000,000) of the total of approximately $50,000,000 for the Long-term Loan. The interest rate for the Long-term Loan was to be a blended rate (*i.e.*, the weighted average of (1) the interest rate on the 90% portion of the total

debt, which was guaranteed, and (2) the higher interest rate on the 10% portion, which was non-guaranteed) equal to the sum of (a) the yield, on a date to be determined, on a hypothetical 13–year United States Treasury Note, plus (b) 150 basis points. (A basis point is 1/100 of a percent; thus, 150 basis points represents 1.50%.)

Ormesa offered the portion of the Long-term Loan that was to be guaranteed by the DOE (the "Guaranteed Notes") with "call protection," that is, an agreement that (1) the Guaranteed Notes could not be repaid prior to a certain time, and that (2) after that time, they could be repaid only with a premium intended to give a lender the benefit of its bargain over the term of the loan. This type of call protection is common in long-term lending to preserve for the lender the benefit of its bargain. Early in the negotiations, TIAA advised Ormesa that it wanted call protection not only for the Guaranteed Notes but also for the Non-guaranteed Notes, and Ormesa agreed to this.

Because TIAA and John Hancock were comfortable with complex transactions of this type, they found this transaction, on these terms, to be highly attractive.

On February 7, 1986, TIAA, John Hancock and Ormesa "circled" the transaction at a blended rate of 10.64%. When a financing is "circled," the parties orally agree that they will do the transaction on the specified terms, and the interest rate and certain other key economic terms are, by this oral agreement, fixed. It is the custom in the financial community that once the parties circle a deal, neither party tries to change the interest rate that has been agreed.

On February 14, 1986, representatives of E.F. Hutton and Ormesa met with DOE Assistant Secretary Donna Fitzpatrick. At that meeting, she was informed of the Long-term Loan interest rate that had been circled on February 7th, and was pleased to hear the rate. As a result, Ormesa and all other parties to the Transaction believed

that the DOE had reviewed and accepted the interest rate.

On February 20, 1986, TIAA's Finance Committee approved the Long-term Loan and authorized TIAA to proceed with the Transaction. On February 26, 1986 John Hancock's Committee of Finance approved the Long-term Loan and authorized John Hancock to proceed with the Transaction. On February 24, 1986, TIAA sent a commitment agreement to Ormesa for signature, and on February 26, 1986, John Hancock did so.

The TIAA commitment agreement was thereafter revised (the "Commitment Agreement"), and Larry Archibald, a TIAA investment officer, signed and sent it to Ormesa for signature on March 14, 1986. Ram discussed the letter with Mrs. Bronicki and with Ormesa's counsel, Robert Giles, who gave his approval for Ormesa's signature on the Commitment Agreement. Hezy Ram returned the Commitment Agreement, signed on Ormesa's behalf, on March 27, 1986.

After John Hancock and Ormesa committed to the Long-term Loan, John Hancock committed itself to a "match funding," *i.e.*, it incurred "matched" obligations relying on the income it would receive pursuant to the Long-term Loan. As a result, John Hancock stood to suffer a substantial loss if its share of the Long-term Loan did not fund. Ormesa knew, no later than the end of June 1986, that John Hancock would suffer a substantial loss if John Hancock's share of the Long-term Loan did not fund.

Interest rates dropped precipitously between February 7, 1986, when the interest rate for this transaction was circled, and July 25, 1986. By July 25, the average of the levels of the 10–year and the 20–year Treasuries—the average used in fixing the original circled rate—dropped 197 basis points. Application of the lower rate would save Ormesa about $1,000,000 a year in interest. Ormesa was aware of this drop in interest rates, and its attempts to back out of the Transaction were motivated by the drop in interest rates.

### C. *Ormesa's Refusal to Proceed as Agreed*

By letter written and dated July 25, 1986 (which was faxed and received on July 28, 1986), Ormesa advised TIAA (and TIAA's co-lender John Hancock) that Ormesa was unwilling to proceed with the Long-term Loan under the terms of the Commitment Agreement. Ormesa breached the Commitment Agreement on that day. Ormesa's determination not to proceed with TIAA resulted solely from Ormesa's determination that with the precipitous drop in interest rates, Ormesa could find a cheaper Long-term Loan elsewhere, and that it was not in Ormesa' financial interest to complete this financing as previously agreed.

The court rejects Ormesa's contentions that the commitment letter was no longer in effect after July 15 because: (1) TIAA allegedly took itself out of the deal on July 15; (2) TIAA allegedly failed to negotiate in good faith to complete the documentation for the transaction within a reasonable time; and (3) the TIAA commitment letter allegedly expired on June 30, 1986.

That Ormesa's determination not to proceed was motivated by the drop in interest rates, and not by either the pre-July 15 events cited by Ormesa or the post-July 15 events cited by Ormesa, is supported by this court's following findings:

(a) Jim Porter of Ormesa told Vince Castellano that it was cheaper to pay $3,000,000 to settle litigation rather than pay the extra $1,000,000 in interest every year;

(b) One or more Ormesa representatives said, at a meeting at the DOE's outside counsel Lillick McHose, in San Francisco, on September 24, 1986 (the "September 24 Lillick Meeting") that the "key issue" was the "economic terms," and that any open issues with respect to the loan documents were not important;

(c) Ormesa stated at a breakfast meeting on September 24, 1986 before the September 24 Lillick Meeting (the "September 24 Breakfast Meeting"), that "the rate was not acceptable" to Ormesa;

(d) Jim Porter stated at a meeting on October 1, 1986, at John Hancock's offices in Boston (the "October 1 Boston Meeting"), that the interest rate should reflect the *current* market, and should be, on a blended basis, 8.75 to 9%, rather than the 10.64% rate previously agreed to;

(e) Lucien Bronicki wrote to TIAA and John Hancock, on November 3, 1986, stating that Ormesa was willing to meet with them "if you are willing to meaningfully discuss interest rates";

(f) Jim Porter wrote to John Hancock's Herb Magid, on November 4, 1986, again attempting to obtain a lower interest rate;

(g) Lucien Bronicki wrote to TIAA, on November 7, 1986, stating Ormesa's position that "our contractual relationship has terminated, notwithstanding our desire to continue to meet with you and discuss a mutually-agreeable interest rate"; and

(h) Jim Porter told E.F. Hutton's Peter Deeks and Jennifer Eplett, on December 2, 1986, that the rate is the only issue between John Hancock and Ormesa.

Ormesa acted in bad faith in refusing to proceed under the Commitment Agreement's original terms. The court finds bad faith based upon: (a) Ormesa's decision not to proceed with the Transaction as previously agreed upon; (b) Ormesa's decision to condition its willingness to proceed on lowering the Long-term Loan's interest rate; and (c) Ormesa's implementation of those decisions. The court makes these findings based upon the matters set forth above and the following additional findings:

(a) Porter told Castellano, after Castellano warned Porter of the likelihood of litigation if Ormesa did not honor its commitment, that "I've broken deals before, and I'm not worried";

(b) Ormesa urged the DOE's Ed Dickinson (who later became an Ormesa employee), at the September 24 Breakfast Meeting, with respect to Ormesa's position that the interest rate was not acceptable to it, "to con-cur in that position so that we would take a united stance to the permanent lenders";

(c) Ormesa excluded counsel for TIAA and John Hancock, the law firm of Milbank, Tweed, Hadley & McCloy ("Milbank") from the July 18, 1986 closing for the construction loan (the "Construction Loan Closing");

(d) Ormesa intentionally delayed the delivery of the Construction Loan Closing documents to TIAA and John Hancock until the beginning of August 1986;

(e) Ormesa's lawyer, Giles, failed to take and return telephone calls from John Hancock's Herb Magid in the days following the Construction Loan Closing;

(f) Giles stated in his letter of July 25 to Milbank's Sid Holderness that Lucien and Dita Bronicki "cannot even be reached by telephone," and that Giles "had not had an opportunity to discuss the contents of the letter with [them]," when in fact he had faxed his draft of that letter to the Bronickis for their comment and approval;

(g) Giles stated in his July 25 letter that the financing "had closed" and that doing a deal with TIAA and John Hancock would require Ormesa "to replace our current commitment for long-term financing" when in fact, Ormesa's commitment from the Federal Financing Bank (the "FFB")—to which Giles was referring—was understood by Ormesa and the DOE to be an *interim* one, in which the FFB was to be used only as a lender of last resort, and Ormesa was contractually *required* to seek commercial financing to replace its "current commitment"; and

(h) Lucien Bronicki stated, in his letter to TIAA and John Hancock of November 3, that the previously agreed interest rate was "not acceptable and would probably not be approved by the Department of Energy," when that was not what the DOE had said.

In summary, Ormesa decided that it was cheaper to defend and/or settle the litigation that Ormesa anticipated than to perform pursuant to the Commitment Agreement. This decision, and the actions Ormesa took to implement it, violated Ormesa's duty to negotiate in good faith.

Thereafter, while construction of the Ormesa plant progressed, the DOE asked Ormesa repeatedly to obtain commercial financing for the Long-term Loan, as required under the Agreement Regarding Term Financing ("ARTF"), one of the Construction Loan's closing documents. Ormesa was aware that the DOE considered the FFB to be a back-up option and that the DOE wished to have a commercial lender substituted for the FFB.

On January 8, 1988, by Hezy Ram's letter to the Manager of the DOE's San Francisco Operations Office, Ormesa gave its Notice of Takeout Date (the "Notice of Takeout"), requesting the DOE "to consummate the takeout by the FFB" on January 22, 1988. The DOE refused to accept Ormesa's Notice of Takeout, finding, among other things, that Ormesa did not comply with its obligation under the Agreement Regarding Term Financing to "make diligent, commercially reasonable efforts" to obtain commercial financing.

In response to the DOE's refusal to accept its Notice of Takeout Date due to Ormesa's failure to pursue commercial financing, Ormesa, in a February 17, 1988 letter from LFC's in-house counsel Herb Brown to the DOE Manager, argued that, under the terms of the Agreement Regarding Term Financing, the DOE agreed to provide the Long-term Loan through the FFB (the "FFB Loan"), irrespective of Ormesa's efforts to seek commercial financing.

On March 7, 1988, the DOE informed Ormesa that the DOE would provide the FFB Loan as a "bridge loan" until Ormesa obtained commercial financing. The DOE included a number of conditions in the FFB Loan as incentives for Ormesa to satisfy its obligation to obtain commercial financing. These incentives included: (a) an express provision in the closing documents that Ormesa make a good faith effort to obtain commercial financing; (b) that Ormesa make a supplemental payment equal to 1% per year above the interest paid on the FFB Note until it obtained commercial financing; and (c) that Ormesa make a second supplemental payment equal to 1% per year above the interest paid to the FFB, if after 36 months Ormesa did not obtain commercial financing.

After further discussions, the DOE agreed to modify the incentives it originally proposed. Ormesa closed on the FFB Loan on May 20, 1988. The interest rate on the FFB Loan was based on the standard markup that the FFB charges all of its borrowers: 1/8 of 1% (or 12.5 basis points) above the level of comparable United States Treasury obligations on the day before the FFB Loan was closed. Ormesa had known, at least as early as July 16, 1986, that this basis was generally used to set the interest rate for an FFB Loan. Ultimately, the formula leading to the computed interest rate for the FFB Loan led to an interest rate for the FFB Loan of 9.3%, a rate significantly below the circled rate and significantly below any Ormesa could obtain in the commercial market.

### D. *Ormesa's Defenses and Counterclaim*

1. The "Walked from the Deal" Contention

Ormesa contends that it had no duty of good faith to complete the Transaction, because the Commitment Agreement ended when TIAA "walked from the deal" in a meeting and conference telephone call on July 15, 1986 (the "July 15 Teleconference"). Ormesa's claim is unsupported by the evidence. TIAA never wanted to, nor did it, withdraw from the Transaction. Ormesa used the July 15, 1986 negotiating statements as a pretext for Ormesa's withdrawing from a transaction that it believed was no longer in its interest.

TIAA acted reasonably and in good faith in attempting in July to preserve the deal it had bargained for in February and March. Call protection for the Long-term Lenders was an integral part of the Transaction; it

was expressly provided for in the commitment agreements of both TIAA and John Hancock. In July 1986, the DOE asked TIAA and John Hancock to give up that protection.

On Thursday, July 3, 1986, the DOE called Milbank's Dave Stagliano, advising Stagliano of the DOE's desire for a provision in the Long-term Guaranty that would give the DOE certain rights in the event of any event of a default by Ormesa, whether or not the default was material. The provision requested by the DOE would give the DOE the right, at its election, to pay off the Long-term Lenders on the DOE guaranty, and thereby effect early payment (or "call") of the Long-term Loan. This provision and variations on it were referred to from time to time by the participants as the "Secretary's Call," or the "DOE Right to Prepay Guaranty."

It was reasonable for TIAA and John Hancock to ask the DOE to withdraw or modify that request. Giving the DOE the right to pay off the loan upon any default, no matter how trivial the default, would negate the call protection that was an express provision in both Long-term Lenders' commitment agreements. Because of the dramatic drop in interest rates (of which the Long-term Lenders, the DOE, and Ormesa were well aware), premature repayment would deprive the Long-term Lenders of the very valuable bargain that they wanted to retain.

Despite that, TIAA and John Hancock did not simply insist that they had a right to call protection, but rather showed a willingness to compromise, offering the DOE the right to call the loan prematurely if: the DOE specified the particular defaults as to which it wanted those rights; the DOE agreed that the loan could be called only if those defaults remained outstanding for a minimum period of time; and the DOE gave the Long-term Lenders reciprocal rights that they did not then have under the then existing documentation. TIAA and John Hancock showed this willingness to compromise even though:

(a) in December 1985, Vince Castellano had expressly asked the DOE whether it had disclosed all of the terms and conditions it would expect regarding the Long-term Guaranty, and the DOE did not mention any request for the Secretary's Call;

(b) neither the first nor the second draft of the Long-term Guaranty prepared by the DOE's counsel Lillick mentioned the Secretary's Call; and

(c) the DOE failed to mention its demand for the Secretary's Call until July 3, 1986 (its in-house counsel having never read its own lawyer's drafts of the Long-term Guaranty until then), after the Transaction had been the subject of negotiation with TIAA and John Hancock for more than six months, and a week after the DOE had determined that all documents were nearly ready for closing.

In the July 15 Teleconference, the Long-term Lenders expressly stated that they desired to do the Transaction, and to provide the Long-term Loan. In addition, the Long-term Lenders then showed a willingness to compromise and made further concessions by reducing the period of time as to which defaults would remain outstanding and by dropping their earlier request that they be given the same rights the DOE was requesting for itself.

At the time of the July 15th Teleconference, TIAA and John Hancock did not repudiate or withdraw from the Transaction, nor did they intend to do so. Indeed, they were trying to do exactly the opposite. The Transaction was an extraordinarily attractive one for them, at a level of 200 basis points above the then prevailing market, and John Hancock had match-funded the Transaction and would suffer a multi-million dollar out-of-pocket loss if it did not fund, as Ormesa was aware. TIAA and John Hancock were working to preserve the Transaction.

The Long-term Lenders did not say that they were withdrawing from the deal at the July 15th Teleconference or at any earlier time. Although recollections differ as to the precise words that were used, the court finds that the Long-term Lenders communicated that the DOE "forced call"

provision was objectionable to them, and that if the DOE continued to insist on it, it could cause the Long-term Lenders not to go through with the transaction. Trial Tr. at 394 (testimony of David Stagliano). At the end of the July 15th Teleconference, it was understood that the DOE would consult DOE headquarters overnight to reconsider its demand for the Secretary's Call (and the Long-term lenders' above-described compromise proposal), and would advise the Long-term Lenders of the DOE position the following day.

This finding is further supported by the following findings:

(a) Sid Holderness and Dave Stagliano sat in Holderness' office on the morning of July 16, waiting for the DOE's call (the "July 16th DOE Conference Call");

(b) The DOE in fact considered its position overnight, and advised TIAA and John Hancock the following day that the Long-term Lenders' compromise proposal was rejected by the DOE— and no mention was made of the lenders having "walked" the day before;

(c) None of the TIAA or John Hancock participants had the authority to cause his company to withdraw from a transaction;

(d) Ormesa's own investment banker and agent, E.F. Hutton, did not understand TIAA and John Hancock to have withdrawn from the Transaction, and so advised Ormesa; E.F. Hutton's Gerry Gminski noted, in addition, that he had never seen an institutional lender "welch";

(e) Dita Bronicki made notes on August 26, 1986 that state that the FFB was used because on "Wednesday, July 16, DOE gave Hancock an ultimatum, and Hancock did not come back with an acceptance" (Pl.Ex. 33);

(f) Ormesa's Hezy Ram understood, on July 16, after the July 15th Teleconference, that if his lobbying efforts to cause the DOE to compromise were successful, and the DOE did show movement on its demand for the Secretary's Call issue, the deal could still

be accomplished between Ormesa, TIAA and John Hancock; and

(g) Both TIAA and John Hancock stated their desire to proceed with the Transaction on Wednesday, July 16, and made no mention of having said or implied that it had withdrawn from the Transaction the prior day.

### 2. The "Transaction Closed" Claim

When TIAA and John Hancock were told in the July 16th DOE Conference Call that the DOE rejected the TIAA–John Hancock proposal of the day before, they were also told that in order to close the Construction Loan quickly, the DOE and Ormesa had determined to close the Construction Loan with a takeout from the FFB. The DOE further stated that the FFB was to be a lender of last resort; that the DOE wanted the Long-term Loan to be provided by commercial lenders; that the DOE welcomed (and indeed preferred) TIAA and John Hancock as lenders; and that closing the Construction Loan with an FFB takeout was a way of giving TIAA and John Hancock time to obtain the necessary approvals to accept the DOE's demands (in light of the DOE's rejection of their proposal).

On July 18, 1986, at the Construction Loan Closing, Ormesa entered into an agreement, called the Agreement Regarding Term Financing (the "ARTF"), with the DOE and Bankers Trust. Under the ARTF, the FFB was to be a lender of last resort, and Ormesa was required to seek commercial financing to replace the FFB takeout commitment. Ormesa was to utilize its FFB takeout only if commercial financing was unavailable. The ARTF had a list of acceptable commercial lenders, and TIAA and John Hancock were at the top of the list. In drafting the ARTF, the DOE did not intend to interfere with any rights TIAA and John Hancock had under their commitment agreements with Ormesa.

The interim nature of the FFB takeout, Ormesa's duty to seek commercial financing, and Ormesa's ability and obligation to continue discussions with TIAA pursuant to the Commitment Agreement are further evidenced by the following findings:

(a) Dickinson stated to E.F. Hutton on July 16 that is was the DOE's intention to turn to the FFB in the short term, and for long term lenders to enter into deal in the long term;

(b) Also on July 16, Dickinson stated to TIAA and John Hancock that the DOE wanted the long term lenders to be TIAA and John Hancock, that the DOE would keep the door open for them, and that ultimately the DOE wanted to bring TIAA and John Hancock into the deal;

(c) At about that time, Dickinson's superior at the DOE, Tom Heenan, described the FFB takeout as a "strategy" to permit participation in the project by TIAA and John Hancock if in the upcoming months the impasses were resolved, stating that its primary objective was to close the deal, and then to bring the original participants back into the deal;

(d) The DOE's attorney Alicia Noyola described the ARTF as providing that the "borrower will continue to seek commercial financing;"

(e) Ormesa and the DOE intended, in preparing the Construction Loan Closing documentation, to preserve a mechanism for the reintroduction of the term lenders, and in part for that reason, they used the most recent drafts prepared by Milbank of the Note Purchase Agreement and the Indenture;

(f) The DOE made numerous statements to Ormesa that obtaining a commercial lender was important to the DOE;

(g) Ormesa itself expressly stated its understanding that the FFB is an interim financing solution; and

(h) The DOE repeatedly reaffirmed its desire for commercial financing in 1988, and established its "Supplemental Interest" requirement as an incentive for Ormesa to obtain commercial financing.

Having Ormesa seek commercial financing was so important to the DOE that in January 1988, when Ormesa requested that DOE have the FFB fund the Long-term Loan, the DOE declined to do so. The DOE declined because Ormesa had failed to make the required efforts to obtain commercial financing, and pointed to Ormesa's refusal to accept the Long-term Loan that TIAA had offered (and continued to offer) on the original terms agreed by the parties.

The DOE ultimately provided the FFB Loan after a United States Senator brought pressure to bear on the DOE on Ormesa's behalf. The DOE did so not because the DOE was persuaded that Ormesa had made appropriate efforts to obtain commercial financing; rather, the DOE did so because Ormesa prevailed in its arguments that Ormesa's efforts to obtain commercial financing were not a condition precedent to the DOE's duty to provide the FFB Loan, and that even a breach of Ormesa's duty to get commercial financing would not relieve the DOE of that duty.

Thus, not only did the Construction Loan Closing in no way impair Ormesa's ability to proceed under the Commitment Agreement; the ARTF was completely consistent with Ormesa finalizing the Long-term Loan under the Commitment Agreement.

Ormesa's decision to proceed with an interim takeout by the FFB, and its decision to "close" the Construction Loan as it did, did not relieve it from its obligations of good faith under the Commitment Agreement. If it was possible and practical for Ormesa to continue to perform under the Commitment Agreement, Ormesa's good faith obligation thereunder continued. Here it was not merely possible and practical for Ormesa to do so; Ormesa was required by its agreement with the DOE to continue to pursue commercial financing. There was nothing in the fact that the Transaction had "closed" that impaired Ormesa's meeting its obligations under the Commitment Agreement.

3. The "DOE Approval of Rate" Claim

DOE regulations gave the DOE the right, on a DOE guaranteed loan, to approve the interest rate; the interest rate was approved on or about May 12, 1986. After Ormesa had its FFB alternative,

however, Ormesa argued that the interest rate that the DOE had approved in May would have to be reviewed again, and that the DOE would now disapprove it.

The court finds that although there is no evidence in the record that the DOE disapproved the previously agreed-on rate, or said it would do so in the future, Ormesa took affirmative steps, in bad faith, to use any DOE rate approval rights to its advantage.

After the Construction Loan Closing, the DOE's prior approval of the rate was still in effect—for as long as the parties would deal with each other in good faith. During that time, however, Ormesa had no intention of proceeding with a transaction that incorporated the previously agreed interest rate. In September 1986, Ormesa called upon the DOE's Ed Dickinson to induce him to say that the interest rate that the DOE had approved in May now would be disapproved, "so that we would take a united stance to the permanent lenders." Dickinson said he could not make such a statement. In actuality, the DOE never withdrew its approval of the interest rate, a fact known to Ormesa. Notwithstanding that, and notwithstanding Dickinson's refusal to state that the interest rate was unacceptable to the DOE, Lucien Bronicki claimed to TIAA and John Hancock, on November 3, 1986, that the previously agreed-upon interest rate was "not acceptable and would probably not be approved by the Department of Energy."

The DOE expressed satisfaction with the interest rate, and disinclination to object to it, in its January 19, 1988 letter to Ormesa. There the DOE stated that Ormesa had failed to meet its obligation to try to obtain commercial financing when it declined TIAA's proffer of the Long-term Loan on the previously agreed-upon terms.

4. The "Commitment Expired" Claim

The Commitment Agreement provided that it would expire if the definitive documents had not been executed by a certain time (initially, April 30, 1986) "unless TIAA has extended said date in writing." That provision, which was in the Commitment

Agreement as protection for TIAA, did not require Ormesa's request or assent as a prerequisite to extensions. Ormesa knew that, and itself noted in a "fact sheet" that the commitment could be extended "at the lenders' discretion." Through the history of this transaction, TIAA extended the Commitment Agreement on a monthly basis, for a total of ten times. The Commitment Agreement had been duly extended when this action was commenced.

On three occasions (shortly after April 30, May 30, and June 30, respectively) extensions of the Commitment Agreement were sent a few days after the Commitment Agreement would have expired pursuant to its previous extension. On each of those occasions, both TIAA and Ormesa ignored what could have been expirations of the Commitment Agreement, and continued their negotiations toward the consummation of the Long-term Loan without regard to any expiration.

TIAA never said that the parties had become released from their obligations to each other because the Commitment Agreement had expired. Nor did Ormesa ever say—either in any "gap" period between the last expiration date and Ormesa's receipt of the next extension letter, or thereafter—that the parties were released from their obligations to each other by reason of the expiration of the Commitment Agreement, prior to Ormesa's letter of July 25, 1986. It was not until it suited Ormesa's interest to do so, and not until Ormesa wished to be relieved of its obligations under the Commitment Agreement, that Ormesa suggested that the parties were relieved of their obligations to each other as a result of the expiration of the TIAA Commitment Agreement.

The court concludes that in each of the periods after the Commitment Agreement expired and before the next renewal letter was mailed, the parties continued their negotiations without regard to the expiration, and neither party considered the Commitment Agreement to be terminated.

5. The "Failure to Accept DOE Demands" Claim

Ormesa argues that it was relieved of its contractual obligations to TIAA because it

was never informed sufficiently, on or after July 16, 1986, that TIAA wished to proceed with the transaction. However, on July 16, 1986, shortly after the July 16th DOE Conference Call, TIAA, after consultation with, and a decision by, its head of Private Placements, David Bullett, decided to accede to the DOE's demand for the Secretary's Call, as John Hancock had done earlier that day. TIAA then so advised Ormesa, through E.F. Hutton, on that day. E.F. Hutton was Ormesa's agent and representative on this transaction; by industry custom it was appropriate for TIAA and John Hancock to notify Ormesa through E.F. Hutton. Notice to E.F. Hutton was, as a matter of industry custom and as a matter of law, notice to Ormesa.

### 6. The "TIAA/Milbank Delay" Claim

This was an unusually complex transaction, even by the standards of multi-million dollar commercial financings. In contrast to the majority of financings, in which there is one financing and essentially two principal players (borrower and lender), here there were three financings—the Long-term Loan, the Construction Loan, and the Subordinated Loan—and a fourth related transaction, LFC's contribution of equity. Rather than two principal players, there were six: the borrower Ormesa (which itself included the two Ormat entities and its equity partner and contributor LFC); two Long-term Lenders, John Hancock and TIAA; the Construction Lender, Bankers Trust; the Subordinated Lender, Kingman Leasing; and the guarantor, the DOE. Additionally, because this was a project financing, rather than a more traditional purchase of unsecured senior notes, the documentation was much more involved. This complexity caused the Transaction to be documented more slowly than planned.

TIAA and John Hancock were sensitive to Ormesa's desire to close the Construction Loan quickly, but many delays slowed down the Construction Loan's closing. These included:

(a) delays on the part of construction lender's counsel, O'Melveny, in drafting the construction loan documents;

(b) delays on the part of Lillick, the DOE's recently retained outside counsel, while it came "up to speed" on the transaction;

(c) the DOE contention, first raised on or about April 15, 1986, that the Long-term Loan interest rate (which had been set on February 7, 1986, and of which the DOE had been informed on February 13, 1986, at which time it had stated its approval) was not acceptable to the DOE, and was subject to disapproval and/or renegotiation;

(d) the passage of approximately three weeks during which time Ormesa did not tell TIAA and John Hancock about the DOE's contention regarding the interest rate;

(e) the passage of additional time during which the DOE reconsidered its position with respect to its disapproval of the previously agreed-upon interest rate;

(f) a period of two business days during which Milbank placed its work on "hold," pending a DOE decision whether it would approve the previously agreed-upon interest rate;

(g) the decision by the DOE's outside counsel, Lillick, that it did not like the security documentation that had been drafted by Milbank, and Lillick's desire to redraft it;

(h) delays by O'Melveny in drafting a form of guaranty for the Construction Loan and the Long-term Loan;

(i) the decision by Lillick, the DOE's outside counsel, that the O'Melveny draft of guaranty was unsatisfactory and had to be redone, and the DOE's decision that Lillick should do it, rather than O'Melveny;

(j) the lack of coordination in arranging meetings and in arranging the exchange of documents to the numerous parties involved, and the practice of circulating new drafts of documents before comments with respect to earlier drafts could be heard and considered;

(k) the determination by the DOE's counsel Lillick to draft the Long-term Guaranty last, even though it was the most critical of all of the documents for the Long-term Loan;

(1) the DOE's failure to circulate even a first draft of the Long-term Guaranty until June 11, 1986;

(m) the failure of the DOE's inside counsel to discuss matters in a timely fashion with the DOE's outside counsel, and his failure to review his own counsel's drafts of the Long-term Guaranty (a first draft and a second draft) for weeks—until approximately July 3, 1986, a week after the DOE had determined that "all documents are now nearly ready for closing;" and

(n) the DOE's raising its new Secretary's Call point on July 3, 1986—which the DOE had never mentioned earlier, in any of the discussions from December 1985 through July 3, 1986—and its subsequent insistence upon it.

Thus, no single party was entirely responsible for the longer than anticipated time to document the various financings. To the extent that any party was the most responsible for the delays, it was the DOE.

Even if Milbank had taken longer to comment on documents than was necessary or appropriate, their delay would not constitute "bad faith." Nor did any delays reasonably attributable to Milbank have a material effect on the timing of the deal, given all of the other factors listed above.

7. The "Open Points" Claim

There was no real possibility that any of the "open points" would bar consummation of the deal if Ormesa were willing to perform. At all times prior to the commencement of this litigation, the parties assumed that the "sticking point" was the interest rate, not other provisions in the documents. The court bases this finding upon the following findings:

(a) Milbank lawyer Dave Stagliano and Lillick lawyer Alicia Noyola had found the documents to be workable, and the "sticking point" was Ormesa's demands as to the interest rate;

(b) Alicia Noyola stated that after her conversations with Stagliano, she was aware of only a few clarifications that Stagliano had requested;

(c) at the September 24 Lillick Meeting, Gerry Gminski noted that the Long-term Lenders had reviewed and approved the documents on which the Transaction had previously closed, subject only to a few "technical" matters that he was sure could be resolved;

(d) Robert Giles stated, with respect to "open points" discussed at the September 24 Lillick Meeting, that "we indicated that these issues were not important, but that the key issue was the economic terms;"

(e) Porter stated at the October 1 Boston Meeting that "the documentation was acceptable" except for minor changes necessary to reflect the Long-term Lenders' return to the Transaction; and

(f) on December 2, 1986, when Porter was asked whether the interest rate was the only issue between Hancock and Ormesa, Porter told E.F. Hutton's Peter Deeks and Jennifer Eplett that the answer was "yes."

The above findings are also applicable with respect to the arguments made by Ormesa concerning the Subordinated Loan. Although Ormesa's Porter, in his Kingman Leasing capacity, clearly did make his Subordinated Loan demands "dealbreakers" from his point of view, Herb Magid of John Hancock acceded to those demands, and TIAA's Larry Archibald decided that he was willing to do the same. Magid expressly agreed to Porter's Subordinated Loan demands on either Wednesday, July 16 (by Magid's account) or July 17 (by Porter's). With knowledge of all of the issues that had been on the table, Porter stated, at the October 1 Boston Meeting, that documentation would not be a problem. He reiterated this on December 2, 1986, when he told Deeks and Eplett that rate was the only issue.

## DISCUSSION

■ Ormesa's primary legal contention is that the commitment letter did not bind the parties to complete the transaction because it did not contain all the material terms of the contemplated loan: Ormesa contends that a mutually satisfactory resolution of those to-be-agreed terms would be required in order to bind the parties to complete the transaction.

Ormesa contends that it was further contemplated that once all material terms were satisfactorily negotiated, TIAA and Ormesa would execute loan documents that themselves would be subject to certain conditions that would have to be satisfied before the loan would be made, and that these conditions were never satisfied. Ormesa contends that the only binding agreement in the TIAA commitment letter was that Ormesa would pay certain TIAA expenses.

The reasons for enforcing some preliminary agreements and the New York law[1] applicable to preliminary agreements such as the Commitment Agreement have been set forth at length in thoughtful opinions by Judge Weinfeld[2] and Judge Leval[3] of this court, and no purpose would be served by repeating those discussions here. Judge Leval's analysis, approved and adopted by the Second Circuit in *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989), is particularly helpful. Judge Leval identified two types of preliminary agreements, one of which is the type of agreement at issue here—an agreement in which the parties have committed themselves to some major terms, but other terms remain to be negotiated in the future. The Second Circuit in *Arcadian Phosphates* adopted Judge Leval's modified version of a test previously used by the Second Circuit in considering unformalized agreements as to which all terms had been negotiated: in determining whether the parties intended to be bound by an

incomplete, preliminary agreement, the Second Circuit stated in *Arcadian Phosphates* that one should look to:

"(1) the language of the agreement [which the Second Circuit characterized as the 'most important' factor], (2) the context of the negotiations, (3) the existence of open terms, (4) partial performance, and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions."

*Id.* at 72.

### a. *Language of the Agreement*

Here the Commitment Agreement expressly said it was a "binding agreement":

If the foregoing properly sets forth your understanding of this transaction, please *evidence acceptance of the conditions* of this letter *by having it executed* below *by duly authorized officers* of Ormesa Geothermal *and by returning one executed counterpart* to TIAA

. . . .

*Upon receipt by TIAA of an accepted counterpart* of this letter, *our agreement* to purchase from you and your agreement to issue, sell and deliver to us, . . . the captioned securities, *shall become a binding agreement between us.*

(Exh. P–1 at 2, emphasis added).

Although there were many open terms to be negotiated, all of the crucial economic terms of the loan were set forth in the Commitment Letter, including the amount and term of the loan, the interest rate, the repayment schedule, the portion of the loan to be guaranteed by the United States government, the security for the guaranteed senior secured notes, the period during which the loan would not be callable, and prepayment penalties applicable thereafter. The language of the agreement suggests that the Commitment Agreement was intended to be, and was, a binding agreement.

---

1. The parties agree that New York law applies to this dispute.

2. *Teachers Ins. & Annuity Ass'n of America v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986) (hereinafter *"Butler"*).

3. *Teachers Ins. & Annuity Ass'n of America v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987) (hereinafter *"Tribune"*).

### b. *Context of the Negotiations*

The parties' actions in the context of the negotiations, which are the subject of the court's findings *supra,* also suggest that the Commitment Agreement was intended to be, and was, a binding agreement.

### c. *The Existence of Open Terms*

The open terms, as the court found *supra,* were terms that customarily are left for later negotiation once the critical terms such as loan amount, term, interest, description of any security and guaranty, and prepayment penalties have been agreed.

### d. *Partial Performance*

■ Although Teachers' partial performance is merely one act among many that suggests that the commitment was viewed as binding, I single it out for comment because partial performance is cited as a factor in *Arcadian Phosphates.* Teachers partially performed its contract with Ormesa by committing $25 million of its funds to the transaction; the court rejects Ormesa's contention that because Teachers did not physically segregate these funds, there was no commitment of the funds by Teachers.

### e. *Customary Form of such Transactions*

It is customary for borrowers and lenders in transactions similar to the one at issue here to accord binding force to preliminary agreements similar to the Commitment Agreement. *See Tribune* at 503.

I conclude that the Commitment Agreement was a binding preliminary agreement that obligated the borrower and the lenders to seek to effectuate a final loan agreement upon the agreed terms by negotiating in good faith to resolve the other terms customarily found in such agreements.

■ Ormesa breached its duty to negotiate in good faith to resolve the issues left open by the Commitment Agreement. By, among other things, insisting upon a lowered interest rate, Ormesa attempted to change and undercut terms that had been agreed to in the Commitment letter. By using as a pretext that TIAA's Commitment Letter had expired [4] and that TIAA had "walked from the deal" on July 15,[5] Ormesa further manifested its failure to negotiate in good faith.

## II. *Damages*

■ Under New York law, a party injured by breach of contract should be placed in the same economic position as it would have been in had the contract been performed. *Butler,* 626 F.Supp. at 1236. TIAA is thus entitled to damages equal to the discounted present value of the incremental interest income TIAA would be expected to lose as a result of the breach.[6]

---

4. The law is clear that even where an agreement expires by its terms, if the parties continue to perform as before, "an implication arises that they have mutually assented to a new-contract containing the same provisions as the old." *Martin v. Campanaro,* 156 F.2d 127, 129 (2d Cir.), *cert. denied,* 329 U.S. 759, 67 S.Ct. 112, 91 L.Ed. 654 (1946). *Accord, Teachers Insurance & Annuity Ass'n of America v. Walter Kidde & Co.,* No. 76 Civ. 5128 (CSH), slip op. (S.D.N.Y. March 15, 1978), reargument denied No. 76 Civ. 5128 (CSH), slip op. (S.D.N.Y. July 28, 1978); *Gannett Co. v. MCP, Inc.,* No. 86 Civ. 0473 (RWS), slip op., 1986 WL 12523 (available on Lexis) (S.D.N.Y. Oct. 24, 1986).

5. TIAA's statements on July 15 cannot be viewed as the "clear and unequivocal" statements of repudiation required by New York law. *See, e.g., Garcia v. Chase Manhattan Bank, N.A.,* 735 F.2d 645, 648 (2d Cir.1984). They were conditional statements concerning hypothetical circumstances, which do not constitute positive statements of repudiation. *See* 4 Corbin, Corbin on Contracts § 973, at 905 (1951); J. Calamari & J. Perillo, Contracts § 12–4(a), at 524–525 (3d ed. 1987).

6. The court rejects Ormesa's contention that the "payment of expenses" language in the Commitment Agreement limits TIAA to reimbursement of its expenses, rather than damages. The court finds that the "payment of expenses" language has to do only with allocation of expenses to the borrower whether or not the loan closed, not with remedy for breach. *See Walter E. Heller & Co. v. American Flyer Airline Corp.,* 459 F.2d 896, 900 (2d Cir.1972).

The court also finds that Ormesa failed to meet its burden of proving that TIAA failed to mitigate its damages. Ormesa claims that TIAA turned down loans at interest rates higher than that in the Commitment Agreement (10.64%), but does not indicate the nature, quality or risk

Specifically, the lost interest income is measured as the difference between (a) the interest income TIAA would have earned had the contract been performed, and (b) the interest income TIAA would be deemed to have earned by timely mitigating its damages—*i.e.*, by making an investment with similar characteristics at the time of the breach.

Although the computation of such damages is mathematically straightforward, it cannot be done without defining certain variables, the definition of each of which is disputed by the parties:

(1) the interest income that would have been earned by TIAA on the Ormesa loan had there been no breach;

(2) the interest income TIAA would have earned from mitigating its damages by making another investment with similar characteristics;

(3) the "discount" rate to be used in calculating the present value of variables (1) and (2).

The calculation of variable (1) is undisputed in many respects; it is calculated by assuming a 10.64% interest rate on a loan of $24,990,500 over 20 years, repaid on the principal repayment schedule set forth in the Commitment Agreement. The parties disagree as to the date that should be used as the assumed funding date. The court finds that the appropriate date to use for the date on which the Ormesa loan would have been funded is January 25, 1988, the date that the Ormesa project was actually certified as completed.[7]

▮▮▮ The calculation of variable (2) requires identification of the "alternate investment" TIAA would be deemed to have made in mitigation. The "alternate investment" should have investment characteristics as close as possible to the original investment, *i.e.*, a principal amount of $24,-990,500, an interest rate of 10.64%, a credit quality of Aa, a term of 20 years (with a 13.334 years average life), monthly payments, and be fairly illiquid. At the time of the breach, there was no alternate investment with these characteristics that TIAA could make, or other loans with similar risk-reward characteristics. Gartland Aff. ¶ 42. Because the court concludes that the damage calculation should take into account not only the general drop in interest levels, but also the lost opportunity to lend at 150 basis points over Treasuries to an entity of approximately Aa creditworthiness, the court adopts as the interest rate at the time of breach the interest rate that prevailed in the market place at that time for "Aa" corporate obligations of a maturity and average life similar to that set forth in the Commitment Letter. In selecting that rate, the court adopts the rate recommended by Arthur J. Gartland, TIAA's expert, 8.47%, which is a rate based on data collected by Salomon Brothers relating to publicly offered "Aa" securities as of August 1, 1986 (I note that this rate is less advantageous to TIAA than the rate for private placements on that date, which, instead of yielding the premium often associated with their somewhat reduced liquidity, yielded a slight discount as compared with publicly offered securities). Ex. P-551; Gartland Aff. ¶¶ 80, 83, 48.

▮▮▮ In order to determine variable (3), the discount rate, the court must decide whether, as a matter of law, the discount rate should impute investment risk to the alternative investment (increasing the discount) or impute minimal credit risk to the alternative investment. TIAA argues for the latter approach, citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). Mr. Gartland states that from an economic

---

of these investments, or the reason they did not eventuate. *See Jenkins v. Etlinger*, 55 N.Y.2d 35, 39, 432 N.E.2d 589, 591, 447 N.Y.S.2d 696, 698 (1982).

7. TIAA argued for a date more advantageous to TIAA in a Supplemental Affidavit of Arthur J. Gartland submitted post-trial. The court sustains Ormesa's objections to new arguments by Mr. Gartland, advanced for the first time post-trial, including the argument that the date of funding should be assumed to be a date the parties *anticipated* in 1986 as the funding date, rather than the later date on which the loan actually would have been funded. The court notes that, in any event, the original Gartland analysis appears to be more reasonable than that contained in the Supplemental Affidavit.

standpoint, in this case, the more appropriate choice is for the discount rate to reflect the same investment risk as the alternate investment. In the court's view, the Supreme Court's determination in *Jones & Laughlin* that the discount rate should be that for the "best and safest" investments was partially dependent on the fact that the parties in that case had stipulated that petitioner would have continued to work until age 65 had he not been injured, and thus that there was no doubt that he would have received the income in question. *Jones & Laughlin*, 103 S.Ct. at 2549. Here, in contrast, TIAA assumed some risk of default. Furthermore, although it may not be appropriate to force unsophisticated individuals to assume risks in investing monetary rewards, those same concerns do not apply to sophisticated investors such as Teachers. The court agrees with Mr. Gartland that the appropriate discount rate is the interest rate assumed for the "alternate" investment.

 In determining damages, the court must also decide whether the alternate investment should be assumed to have the same average life as the Ormesa loan, or whether it is more important to preserve the level payments feature present in the Ormesa loan. (As the Gartland Affidavit explains at ¶ 62, it is a quirk of discount arithmetic that when a stream of level payments is computed using an interest rate lower than 10.64%, the lower interest rate has the effect of producing a slightly shorter average life for the loan. Gartland Aff. at ¶ 62.) Judge Weinfeld in *Butler* preserved the level payments feature at the expense of preserving the average life. The court agrees with Mr. Gartland that a more accurate comparison is effected by keeping the average life the same between the Ormesa loan and the alternate loan.

Using the assumptions adopted in this decision, TIAA's damages are $4,094,530 for the whole loan on a blended basis.

 Finally, there remains the question of prejudgment interest. Although both parties agree that prejudgment interest is at least theoretically available in this case, Ormesa suggests calculating it in a manner that would render it meaningless. Ormesa bases its argument on the language of CPLR § 5001(b), which governs the award of "interest to verdict," and the cases applying it. Section 5001(b) provides that:

interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

Ormesa argues that this statute is controlling because Teachers would not have received all of its profit for the loan on the date the loan would have been funded, January 25, 1988, but rather in installment payments over a period of 20 years. As a result, Ormesa contends, interest in this case should run from a reasonable intermediate date between February 1988, the date the first payment would have been due had the loan been funded, and the time the last payment would have been received, twenty years later. That intermediate date would be February 1998, and would preclude an award of prejudgment interest in this case.

Ormesa's argument, however, confuses two different concepts that courts generally group together under the rubric of prejudgment interest. A recent Second Circuit decision, *Woodling v. Garrett Corp.*, 813 F.2d 543, 559–61 (2d Cir.1987), decided subsequent to *Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co.*, 804 F.2d 787 (2d Cir.1986), the case on which Ormesa relies, highlights the distinctions between these two concepts. Although *Woodling* dealt with a personal injury award, its reasoning is applicable to this case. The most familiar of these two categories of interest is interest on losses that plaintiff suffered between the date of injury and judgment or decision in a case. It is this type of interest that is at issue in *Esquire*. The second type consists of interest on losses that continue after judgment, but for practical reasons are discounted back to the date from which the

losses began to run to enable a lump sum award. A more fitting term for this type of interest would be prejudgment interest on postjudgment losses. *See id.* at 560. In its discussion of these two categories of interest, the court mentioned § 5001(b) only in conjunction with the former type of interest, implying that the statute did not apply to the latter category of interest.[8] The court also said that prejudgment interest for postjudgment losses was appropriate as long as the award for future losses was discounted all the way back to the date of injury, *id.* at 559, as was done in this case. In such instances, the court recognized, "the award of prejudgment interest starting from the same date is needed to provide full compensation for the loss." *Id.* at 560. That is precisely the situation present in this case.

Moreover, as the *Woodling* decision implies, and as an even more recent Second Circuit decision makes clear,[9] Ormesa's arguments make little economic sense and run counter to the underlying purpose of prejudgment interest. The purpose of a prejudgment interest award is to remedy the delay in compensating plaintiff for a loss, a purpose reflected in CPLR § 5001(b). *Woodling*, 813 F.2d at 561. In awarding damages in the form of a one time payment equivalent to the stream of income Teachers would have received from the loan, the award to Teachers does the same thing. But, as the concept of discounting for present value dictates, the award is much smaller than the sum of the future lost income. This is so because the concept of present value rests on the assumption that the smaller, discounted award would grow into the larger amount by earning interest. Not allowing that discounted award to draw interest, as Ormesa urges, would deprive Teachers of that growth and would thus destroy the premise underlying the concept of present value discount. In the words of Justice Stevens,

the award of interest "on that discounted sum for the period between injury and judgment [is necessary] in order to ensure that the award when invested will still be able to replicate the lost stream." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. at 538 n. 22, 103 S.Ct. at 2551 n. 22, *quoted in In re Connecticut Nat'l Bank*, 928 F.2d at 43 n. 6. Under the Ormesa approach, Teachers would be worse off than it was before Ormesa's breach—Teachers received a discounted award that assumes it will draw interest, without the opportunity to actually collect interest. Such a result is impermissible, and is not mandated by CPLR § 5001(b).

Accordingly, the court awards prejudgment interest at the rate of 9%, as provided by CPLR § 5004, commencing on January 25, 1988, the date the Ormesa loan would have been funded.

The foregoing shall constitute the court's findings of fact and conclusions of law. Judgment may be entered accordingly.

SO ORDERED.

---

**8.** Indeed, Ormesa has not cited, and the court has not found, any cases applying § 5001(b) to an award discounted for present value.

**9.** *In re Connecticut Nat'l Bank*, 928 F.2d 39 (2d Cir.1991), was an admiralty case, and thus involved the application of federal, rather than New York, law. Nonetheless, it contains a cogent discussion of the economic concepts involved in present value analysis, the relevance of which is not limited to federal law.