**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| P.C. CONNECTION, INC. d/b/a CONNECTION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0869-JTL |
| SYNYGY LTD., SYNYGY LLC, SYNYGY PTE. LTD., OPTYMYZE PTE. LTD., OPTYMYZE LLC, and MARK A. STIFFLER, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Date Submitted: November 20, 2020
Date Decided: January 7, 2021

Daniel A. Griffith, WHITEFORD TAYLOR PRESTON LLC, Wilmington, Delaware; Christopher H.M. Carter, Daniel M. Deschenes, Laurel M. Gilbert, HINKLEY ALLEN & SNYDER LLP, Manchester, New Hampshire; *Attorneys for Plaintiff.*

Andrew S. Dupre, Brian Lemon, Stephanie H. Dallaire, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Defendants.*

**LASTER, V.C.**

The defendants constitute a group of interrelated entities ultimately controlled by their principal, Mark Stiffler (collectively, the "Stiffler Organization"). Since 2013, plaintiff P.C. Connection, Inc. ("Connection") has licensed software from the Stiffler Organization. Connection uses the software to calculate and pay compensation to over 1,100 employees.

Beginning in 2018, the Stiffler Organization sent Connection a series of invoices which demanded that Connection pay additional fees beyond what Connection had contracted to pay. In 2019, the Stiffler Organization proposed a new agreement that contemplated a much higher annual fee than Connection customarily had paid. While Connection was securing the internal approvals for the agreement, the Stiffler Organization withdrew its proposal and claimed that Connection owed $5.4 million in past due fees—an exorbitant amount in the context of the parties' relationship—and would have to agree to an approximately four-fold increase its annual fee. The Stiffler Organization threatened to cut off access to its mission-critical compensation software unless Connection capitulated.

Connection responded by filing this lawsuit. Connection ultimately seeks declaratory relief and monetary damages under a variety of theories. In the interim, Connection moved for a preliminary injunction that would prevent the Stiffler Organization from terminating Connection's access to the compensation platform pending final disposition of Connection's claims. This decision grants Connection's request for a preliminary injunction.

## I. FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with Connection's request for a preliminary injunction. What follows are not formal factual findings, but rather the facts as they appear reasonably likely to be found after trial, based on the current record.

### A. The Stiffler Organization

The Stiffler Organization comprises a complex, opaque, and frequently changing mélange of entities ultimately controlled by Stiffler. Through various entities, the Stiffler Organization provides its customers with access to a software platform for managing compensation schemes (the "Compensation Platform"), which the Stiffler Organization tailors to its customers' needs. The Compensation Platform enables the Stiffler Organization's clients to calculate and pay compensation using complex formulas, including various forms of incentive compensation. The Stiffler Organization also provides consulting services and support for its software platform.

During the events giving rise to this litigation, Stiffler restructured his entities on multiple occasions. As part of these restructurings, the Stiffler Organization has purported to transfer Connection's contracts from one entity to another. According to the Stiffler Organization's current position in this litigation, only Synygy Pte. Ltd., a Singapore entity ("Synygy Singapore"), currently has any contractual obligations to Connection. This assertion conflicts with contemporaneous documents in which the Stiffler Organization claimed that either Optymyze LLC, a Delaware limited liability company ("Original

Optymyze"), or Optymyze Pte. Ltd., a Singapore entity ("Optymyze Singapore"), were Connection's contractual counterparties.

**B.     Connection**

Connection is a publicly traded Delaware corporation with its principal place of business in Merrimack, New Hampshire. Through various subsidiaries, Connection sells custom computer systems and services to businesses and government agencies in the United States. One pertinent subsidiary is MoreDirect, Inc.

Connection has a sales force of approximately 1,100 employees. Connection pays its employees using various incentive-based compensation plans. The compensation plans are complex, and calculating the employees' compensation requires the application of nearly 200 rules and formulas. *See* Dkt. 61 ¶¶ 59–60 ("Murrah Decl.").

**C.     The 2013 Master Agreement**

Effective June 30, 2013, Connection and the Stiffler Organization entered into a Master Services Agreement. Compl. Ex. A (the "2013 Master Agreement" or "2013 MSA"). At the time, the Stiffler Organization was operating through Synygy Ltd. ("Original Synygy"), a Delaware corporation. Connection's counterparty under the 2013 MSA was Original Synygy. Stiffler signed the 2013 Master Agreement on behalf of Original Synygy. 2013 MSA at 8.

The 2013 Master Agreement contemplated that the Stiffler Organization would provide Connection with access to the Compensation Platform. *See id.* §§ 1–2. Befitting its title as a "master agreement," the 2013 Master Agreement envisioned that Connection

3

and Original Synygy would execute a series of "statements of work" that would identify the specific software and services that the Stiffler Organization would provide. *Id.* § 1.

Connection agreed to pay the Stiffler Organization in accordance with the statements of work. *Id.* § 12.1. Connection agreed that late fees would accrue on any amounts owed under any statement of work beginning thirty days after each invoice date. *Id.* §§ 12.1–12.2. If any amounts were more than thirty days overdue, then the Stiffler Organization could demand immediate payment and suspend Connection's access to the Compensation Platform after giving Connection seven days' notice. *Id.* § 12.3.

The 2013 Master Agreement provided that it would "automatically terminate upon the termination or expiration of the term of all Statements of Work." *Id.* § 11.6. It further stated that either party could terminate a statement of work "for cause upon 30 days written notice to the other party of a material breach of the [2013 Master Agreement] or the Statement of Work if such breach remains uncured at the expiration of such 30-day period." *Id.* § 11.3. The 2013 Master Agreement did not define "material breach."

**D.    The 2013 SOW**

Contemporaneously with the 2013 Master Agreement, Connection and the Stiffler Organization entered into a statement of work that defined the parties' rights and obligations concerning the Compensation Platform. Compl. Ex. C (the "2013 SOW").[1]

---

[1] Connection and Stiffler Organization also entered into a statement of work governing the implementation of the Compensation Platform. Compl. Ex. B. That statement of work terminated once the Stiffler Organization set up the Compensation Platform for Connection's use. It is not at issue in this case. *See* Compl., Ex. B § 5.1; Compl. ¶ 33 n.1; Answer ¶ 35.

4

Using the term "Software Services" to refer to the Compensation Platform, the 2013 SOW obligated the Stiffler Organization to make "Software Services available to [Connection] pursuant to the [2013 Master Agreement] and this Statement of Work during the term of this Statement of Work." 2013 SOW §§ 1, 1.2.

The 2013 SOW had an initial term of five years "unless terminated earlier as set forth herein or in the [2013 Master Agreement]." *Id.* § 6.1. At the end of the initial term, the 2013 SOW would "automatically renew[] year-to-year for an additional one (1) year term unless terminated by either party by providing at least ninety (90) days advance written notice to the other party before the expiration of the [current term]." *Id.* Either party could terminate the 2013 SOW for cause if the other party committed a "material breach." *Id.* § 6.3. The 2013 SOW did not define "material breach" exhaustively, but it stated that a material breach "include[s] a party's repeated breaches of its duties or obligations under this Agreement or a Statement of Work in any calendar month, the cumulative effect of which would reasonably be deemed to be a material breach of this Agreement or the applicable Statement of Work." *Id.* If one party committed a material breach, the 2013 SOW would terminate if that party failed to cure its breach within thirty days of receiving the other party's written notice of breach. *Id.*

The 2013 SOW contemplated that in return for an annual license payment, Connection could use the Compensation Platform to pay a specified number of individuals. Connection also could allow specified numbers of other users to work with the Compensation Platform. The 2013 SOW identified three categories of potential users: Participant Users, Administrative Users, and Technical Users. Exhibit B to the 2013 SOW

5

specified that in return for the annual license fee, Connection could use the Compensation Platform for up to 700 Participant Users, and it could give access to the Compensation Platform to fifteen other individuals who were not Participant Users. Connection could have five Administrative Users and three Technical Users. These numbers were not hard caps, because under the 2013 SOW,

> Subscriptions for additional numbers of Participants and Users may be added during the applicable Term at the same pricing as that for the pre-existing subscriptions, prorated for the remainder of the Term in effect at the time the additional User subscriptions are added.

2013 SOW § 1.1.

Exhibit B to the 2013 SOW also described the initial configuration of the Compensation Platform that the Stiffler Organization would provide. In a section titled "Configuration Limitations," the Stiffler Organization agreed to "do an initial data load of up to 1 gigabyte of input data" and "provide total disk storage of up to 1,000 gigabytes of data." In a section of Exhibit B titled "Software Services Limitations," the Stiffler Organization agreed to "provide for a total of up to 1 gigabyte of input data per processing period."

In return for these services, Connection agreed to "pay all fees specified in Exhibit C to this Statement of Work in accordance with the Invoicing and Payment terms in the [2013 Master Agreement]." 2013 SOW § 5. Exhibit C specified an annual base subscription fee of $177,000, plus "Incremental Subscription Fees" based on additional users at the end of each monthly period. The incremental annual fee was $221 for an additional Participant or Participant User, $3,000 for an additional Administrative User, and $6,000 for an

6

additional Technical User. The Stiffler Organization agreed to notify Connection "in writing if there are increases in the Software Services provided by Us because limitations in this Statement of Work are exceeded." 2013 SOW Ex. C. The 2013 SOW did not provide for any additional fees for data usage or storage. Its silence suggests that the parties anticipated that additional users inherently would require additional data usage and storage such that the incremental fees for additional users would cover those services as well.

The 2013 SOW permitted the Stiffler Organization to increase its fees once per year if necessary to cover its costs, subject to an annual cap of five percent. The provision stated,

> During the Initial Term (as defined above), the Software Services Subscription Fee may be increased once annually to reflect Our increase in the costs of doing business; however, the annual fee increase will be capped at five (5) percent. At the end of the Initial Term, We may increase the Software Services Subscription Fee to Our then-current pricing by providing You with ninety (90) days advance written notice.

*Id.*

### E.     The 2017 SOW

On April 1, 2017, Connection and the Stiffler Organization executed a second statement of work so that MoreDirect could use the Compensation Platform. Compl. Ex. D (the "2017 SOW"). While the parties were negotiating the 2017 SOW, the Stiffler Organization claimed that two years earlier, in 2015, Original Synygy had assigned the 2013 SOW to Synygy LLC, a Delaware limited liability company ("New Synygy"). Murrah Decl. ¶ 4; *see also* Dkt. 58 ("Yeo Decl.") ¶ 3; Answer ¶ 11. The Stiffler Organization claimed that as a result of that transaction, New Synygy was the "successor-in-interest" to Original Synygy. Compl. ¶ 15; Murrah Decl. ¶ 4; *see also* 2017 SOW at 1.

7

The Stiffler Organization took the position that as a result of the transaction, Connection's counterparty under the 2013 Master Agreement and 2013 SOW was New Synygy. The Stiffler Organization drafted the 2017 SOW with New Synygy as the counterparty. *See* 2017 SOW at 1.

Unlike the 2013 SOW, the 2017 SOW divided the services that the Stiffler Organization would provide to MoreDirect into "Cloud Services" and "Professional Services." The former encompassed use of the Compensation Platform and other software services. *See id.* Ex B. The latter encompassed consulting services and ongoing customer support. *See id.* Ex. A.

In an exhibit governing the Cloud Services, the Stiffler Organization committed to make the Compensation Platform available "for up to 175 participants belonging to [MoreDirect's] sales force." *Id.* Ex. B. As with the 2013 SOW, the specified number of users was not a hard cap. The 2017 SOW provided that "[i]f the Cloud Services requested by You exceed the scope of Cloud Services described above, then for an additional fee, and with adequate notice and upon Your approval, We will provide additional Cloud Services." *Id.* The parties agreed that the Stiffler Organization would bill MoreDirect for any additional Cloud Services at its then-current rates. *See id.* Ex. D.

In an exhibit governing the Professional Services, the Stiffler Organization agreed to maintain specific levels of full-time equivalent ("FTE") staff to support MoreDirect. *Id.* Ex. A. The number of FTE staff also was not a hard cap. If MoreDirect required additional support, then the Stiffler Organization agreed "upon reasonable request from You and upon Your approval, [to] provide additional Professional Services for an additional fee as

8

described in the fee adjustments section of Exhibit D." *Id.* MoreDirect could either pay a flat annual fee for additional FTE staff or purchase additional services based on a weekly fee schedule. *Id.* Ex. D.

As compensation for the baseline services contemplated by the 2017 SOW, MoreDirect agreed to pay a one-time deployment fee of $105,750 and an annual Cloud Services fee of $70,768. *Id.* Like the 2013 SOW, the 2017 SOW permitted the Stiffler Organization to raise its fees by up to five percent annually. *Id.*

The 2017 SOW had an initial term of three years. *Id.* § 5.1. After the initial term, the 2017 SOW would "automatically renew[] for an additional two (2) year term every two years, unless terminated by either party by providing at least ninety (90) days advance written notice to the other party before the expiration of the [current term]." *Id.* Either party could terminate the 2017 SOW for cause if the other party failed to cure a material breach of its terms within thirty days of receiving the other party's written notice of breach. *Id.* § 5.2. The 2017 SOW did not separately define the phrase "material breach."

## F.     The Purported Assignment To Optymyze Singapore

On June 5, 2018, Connection received an email from an individual with the Stiffler Organization named Manish Singh. The email purported to give Connection notice that the Stiffler Organization had assigned the 2013 Master Agreement to Optymyze Singapore. *See* Murrah Decl. Ex. A.

The email was addressed to "Accounts Payable Team" and stated, "Please see attached letter of Assignment of Master Services Agreement to [Optymyze Singapore]." *Id.* The email attached a letter from the "Optymyze Invoicing Team" which stated, "We

9

are writing to inform you that as a result of changes to our corporate entity structure, effective as of January 1, 2018, the Agreement between [Original Optymyze] and [Connection] is assumed by [Optymyze Singapore], and the terms and conditions therein will remain unchanged." *Id.* at '392.

The notice did not explain how Connection's existing contracts had morphed into agreements with Original Optymyze. The notice did not explain how Optymyze Singapore became the counterparty under the agreements.

A second attachment described Optymyze Singapore as "a Singapore company [which] is owned by Elverta Corporation for U.S. tax purposes, a foreign corporation registered in the British Virgin Islands, which is ultimately owned by a U.S. trust." *Id.* at '402. The notice stressed that payments to Optymyze Singapore were not subject to United States tax withholding. *Id.*

After June 5, 2018, the Stiffler Organization issued all of its invoices to Connection under the name of Optymyze Singapore. Murrah Decl. ¶ 7. Connection made all of its payments under those invoices to bank accounts held in the name of Optymyze Singapore. *Id.*

After June 5, 2018, the Stiffler Organization communicated with Connection concerning the 2013 Master Agreement and its associated statements of work through individuals who held themselves out as representing "Optymyze." *Id.* ¶ 6. From June 2018 to August 2020, those individuals communicated with Connection through email using "Optymyze" email addresses. *Id.*

10

For example, on June 11, 2018, an individual with the Stiffler Organization named Heidi Quaschnick sent Connection an email stating:

> I am sending you an updated version of the amendment for the additional participants/agreement extension. We've made some changes to our corporate entity structure and have assigned the agreement with [Connection] to [Optymyze Singapore]. I have attached the notice our team sent to your accounts payable team to inform PC Connection of this change. Everything else in the amendment remains the same, only the entity changes.

*Id.* Ex. C. The email attached a proposed amendment to the 2013 SOW. *Id.* at '387–88 (the "2018 Proposal").

The 2018 Proposal recognized that Connection could increase its use of the Compensation Platform simply by paying additional amounts for additional users. The 2018 Proposal recited that "[a] recent user headcount audit has shown that the number of Users using the Services under the [2013 SOW] has increased since the beginning of 2018." *Id.* at '387. The 2018 Proposal provided for an increase of 205 users, spread across three categories, and identified a fee schedule that would apply. *Id.* The 2018 Proposal backdated the increase to January 1, 2018, and calculated an increase in Connection's annual fee of $69,789. *Id.*

### G. The Stiffler Organization Proposes An Omnibus Agreement.

During summer 2018, while the Stiffler Organization was attempting to document the purported transfer of the 2013 Master Agreement and associated statements of work to Optymyze Singapore, members of the Stiffler Organization approached Connection about entering into a new omnibus agreement. *Id.* ¶ 32. On June 29, 2018, the 2013 SOW renewed automatically for an additional year. The Stiffler Organization proposed to have the new

11

omnibus agreement take effect when the 2013 SOW ended and cover services for both Connection and MoreDirect. *See id.* Ex. O.

After approaching Connection about a new omnibus agreement, the Stiffler Organization did not invoice Connection for the annual subscription fee for the one-year renewal term. *Id.* ¶ 26. Stefan Murrah, Connection's Senior Director of Business Reporting and Incentive Compensation, emailed his Optymyze counterpart several times asking about the invoice. *Id.* Ex. I.

On October 4, 2018, the Stiffler Organization finally sent the invoice for the annual subscription fee. *Id.*, Ex. J at '586–87. The invoice claimed that Connection owed $306,556.15, nearly double the original amount of the annual software subscription fee under the 2013 SOW. *Id.* at '587. On the same day, the Stiffler Organization sent a second invoice for $52,596.49 for "additional annual software services subscription fee for increase in users count, effective from 1/1/2018 - Prorated from 1/1/2018 to 6/29/2018." *Id.* at '584–85.

Alarmed, Murrah wrote back that "something looks very wrong here. . . . You told us we were auto-renewed at our prior rate, and we have not signed off on implementing any additional functionality, modules or enhancements, so this is troubling. . . . Last year, our maintenance fee was $158,652.84." *Id.*, Ex. K. at '206. The Stiffler Organization claimed that the base fee for the prior year had been $190,383 and that the Stiffler Organization had increased it by five percent as permitted under the 2013 SOW. The Stiffler Organization claimed that the remainder of the fee increase was due to additional users on the Compensation Platform. *Id.* at '205–06.

12

Murrah explained that the Stiffler Organization was billing Connection for 2,001 users, when in fact Connection had a total of 1,038 users. *Id.* at '204. Connection also identified other errors in the calculation. The Stiffler Organization eventually issued revised invoices for 1,056 users, and Murrah approved them for payment in November 2018. *Id.* Ex. L; *see id.*, Ex. K at '202. The amount of the revised invoice for "additional annual software services" was reduced from $52,596.49 to $36,793.48, and the amount of the revised invoice for the annual software subscription fee was reduced from $306,556.15 to $274,511.15. *See id.* Ex. L. During these exchanges, no one from the Stiffler Organization suggested that Connection had breached the 2013 Master Agreement or its associated statements of work by adding additional users. *See, e.g., id.* ¶¶ 21, 57.

## H.     The Pressure Campaign

The incident regarding the unexpected and higher invoices turned out to be part of a larger attempt by the Stiffler Organization to pressure Connection into paying increased fees. By issuing unjustified invoices and charging ever increasing amounts, the Stiffler Organization sought to coerce Connection into entering into an omnibus agreement that was skewed in favor of the Stiffler Organization.

On January 18, 2019, three months after sending the first pair of inflated invoices, the Stiffler Organization sent another invoice. This time, the Stiffler Organization charged Connection $26,700 for "2018 Data Storage Overage." *Id.* ¶ 35, Ex. M. The 2013 Master Agreement and the 2013 SOW did not contemplate a charge for data storage, and no one from the Stiffler Organization had ever suggested that Connection would be billed separately for this service. The invoice reflected $53,400 in overage fees, subject to a "50%

13

Courtesy Discount for 2018 Overage (Pending New Signed Order)." *Id.* Ex. M. The supposed "discount" was a thinly-veiled threat that the Stiffler Organization would demand even more in overage fees if Connection did not agree to the new omnibus agreement.

On March 28, 2019, the Stiffler Organization made a presentation to Connection about a new agreement. *Id.* ¶ 38, Ex. O. The Stiffler Organization emphasized that the 2013 SOW would expire on June 29, 2019, resulting in the "[n]eed for [a] new agreement." *Id.*, Ex. O at '851–52. The presentation outlined various fee schedules for different levels of service and identified other charges, such as data storage, that Connection could pay for annually or purchase *à la carte*. *Id.* at '855–58. The presentation implied that the Stiffler Organization wanted to continue its commercial relationship with Connection. Among other things, the presentation touted the parties' "[s]trong operational partnership" and envisioned an expanded role for the Compensation Platform going forward. *Id.* at '860. As "Next Steps," the presentation proposed that the parties "[r]eview all services levels and put in the new model," then "[s]chedule [a] meeting to review [the] resulting proposal." *Id.* at '861.

That same day, the Stiffler Organization sent Murrah an email that attached a letter from Stiffler. *Id.* ¶ 39, Ex. P. Dated more than three weeks earlier, on March 6, 2019, the letter claimed that Optymyze Singapore had decided not to renew the 2013 SOW. *Id.* (the "Non-Renewal Notice"). Stiffler represented that the decision was due to "our desire to enter into a more strategic relationship" with Connection. *Id.* He claimed that his goal was "for the new agreements to be effective" when the 2013 SOW's term ended on June 29, 2019. *Id.*

14

Two months after sending the Non-Renewal Notice, the Stiffler Organization sent yet another unexpected invoice to Connection. This invoice, dated May 6, 2019, claimed that Connection $23,601.56 for "Data Management Services" from January 2019 through March 2019. *Id.* ¶ 36, Ex. N. When Murrah objected to the invoices, the Stiffler Organization responded that they would waive the charges once the parties completed a new agreement. *Id.* ¶ 37.

## I.     The Non-Renewal Date Passes.

By June 29, 2019, Connection and the Stiffler Organization had not completed a new agreement. Assuming the Non-Renewal Notice was valid, then as of that date, the 2013 SOW expired in accordance with its terms. But nothing about the parties' relationship changed. The Stiffler Organization continued providing the same services to Connection, and Connection continued using them. *Id.* ¶ 43.

On August 3, 2020, the Stiffler Organization emailed Connection a new Master Services Agreement. *Id.*, Ex. Q at '570 (the "Proposed Agreement"). The Proposed Agreement provided for an annual subscription fee starting at $475,000, billed retroactively to cover the period from July 1, 2019, through June 30, 2020. That amount reflected an increase of more than $129,000—or thirty-eight percent—over the combined fees that Connection had been paying under the 2013 and 2017 SOWs.[2] The Stiffler Organization

---

[2] At this stage in the proceedings, it is difficult to determine the precise amount of the annual fees Connection was paying under the 2013 and 2017 SOWs as of August 2020. Before the Stiffler Organization sent the Proposed Agreement on August 3, 2020, the parties had renegotiated the annual fees under the 2013 SOW in November 2018, when

simultaneously caused Optymyze Singapore to issue two invoices under the Proposed Agreement: one for $475,000 for the period from July 1, 2019, to June 30, 2020, and another for $505,000 for the period from July 1, 2020, to June 30, 2021. Murrah Decl. ¶ 45, Ex. R.

Exactly two weeks later, before Connection had executed the Proposed Agreement, the Stiffler Organization withdrew it. An individual with the Stiffler Organization named Firoz Memon emailed Connection, claiming that "given the length of time that has elapsed since our proposal was issued in 2019, our deal desk reviewed the proposal and has informed us that we will not be able to go ahead with the proposal." *Id.* Ex. S. Because only two weeks had passed, that explanation appears contrived. Memon stated that the Stiffler Organization would "present a new proposal, updated to reflect the changes in our pricing approach and terms." *Id.*

In response, Connection asked the Stiffler Organization to reconsider its withdrawal of the Proposed Agreement. Murrah explained that Connection had been obtaining the internal approvals necessary to execute the Proposed Agreement and represented that Connection was ready to pay the two invoices. *Id.* ¶ 47, Ex. T. The Stiffler Organization

---

they agreed that Connection would pay $274,511.15 for 1,056 users. *See* Part I.G, *supra*. Connection also was paying at least $70,768 under the 2017 SOW, resulting in an aggregate fee of $345,279. Connection has represented that the fees it paid at the time were "less than $350,000," without providing a specific amount. Dkt. 56 at 19. The percentages that appear in the text are based on annual payments of $345,279, which is an amount that is "less than $350,000."

did not engage. A different representative of the Stiffler Organization stated only that he had "shared your note internally." *Id.* Ex. T.

On September 3, 2020, having heard nothing more from the Stiffler Organization, Connection paid $926,924 to Optymyze Singapore, reflecting the total amount billed under the two invoices. Connection also executed and returned a copy of the Proposed Agreement. Optymyze Singapore accepted the $926,924. *Id.* ¶ 48.

## J. The Debut Of Synygy Singapore And The $5.4 Million Charge

On September 15, 2020, Connection received an email from an individual with the Stiffler Organization who identified himself as Kian Kee Yeo, a director of Synygy Singapore. *Id.* ¶ 13, Ex. F. The email claimed that Optymyze Singapore had never been Connection's counterparty after all. Instead, Connection's counterparty supposedly had always been Synygy Singapore. *See id.* Ex. A.

Yeo's email attached a letter purportedly "clarifying [that] the owner of your 2013 agreement with [Original Synygy]" was actually Synygy Singapore. *Id.*, Ex. F at '334. The letter claimed that Original Synygy "was an early distributor of Optymyze software" and that its contracts "were acquired by [New Synygy] in 2015." *Id.* at '335. The letter stated that in 2017, "in connection with US tax reform," New Synygy "and its sister company [Original Optymyze] . . . , U.S. subsidiaries of the UK-based parent (Elverta Corporation), stopped entering into client contracts, and the parent ceased owning a U.S. trade or business." *Id.* The letter claimed that the 2013 Master Agreement and 2013 SOW were transferred to Synygy Singapore on January 1, 2018, although "it may wrongly have been believed by the parties to have been assigned to [Optymyze Singapore] at some point

17

during 2018." *Id.* The letter denied that there was any "record of acceptance of assignment" by Optymyze Singapore and stated that "for the sake of clarity, this letter confirms that the Synygy Agreement was assigned to, and the assignment was accepted by, [Synygy Singapore]." *Id.*

On the same day, Stiffler himself sent a letter to Connection, claiming the communication was "[a]uthorized by Optymyze [Singapore]." Compl. Ex. E. In that letter, Stiffler claimed that Optymyze Singapore had withdrawn the Proposed Agreement because the Proposed Agreement had not addressed "obligations due under the 2013 agreement." *Id.* Stiffler now claimed that those obligations totaled $5.4 million. *Id.*

Stiffler attached two memoranda that supposedly supported these charges. *Id.* at 2–4. The memoranda did not cite any contractual provisions. They simply characterized as "overage" virtually all of Connection's data usage from January 2019 to January 2020, as well as all of the professional services that Connection used from May 2019 through April 2020. *Id.* Before Stiffler's letter, the Stiffler Organization had never invoiced Connection for any portion of the alleged $5.4 million, disclosed any such charges, or demanded payment. *See* Murrah Decl. ¶ 52.

In his letter, Stiffler demanded that Connection accept a new five-year agreement that would increase its annual subscription fee to $1.8 million. *Id.* That new amount was more than four times the $425,000 that the Stiffler Organization had demanded in the Proposed Agreement. It represented an increase of 421% over the combined fees that Connection had been paying under the 2013 SOW and 2017 SOWs.

In his letter, Stiffler demanded that Connection make an immediate payment to Optymyze Singapore in the amount of $993,403 to cover the retroactive application of the $1.8 million fee to January 1, 2020. Compl. Ex. E. Stiffler's letter did not explain why the payment would go to Optymyze Singapore when the Stiffler Organization was claiming simultaneously that Optymyze Singapore had never been Connection's counterparty under the relevant agreements.

When calculating the payment that Connection allegedly owed, Stiffler added $138,019 in subscription fees for the six months from June 30, 2019, to December 31, 2019. *Id.* That period extended six months after the 2013 SOW supposedly ended on June 29, 2019. When calculating these amounts, Stiffler used the fee schedule in the 2013 SOW. Stiffler's letter thus recognized that the parties had continued to operate as if the 2013 SOW remained in place after the non-renewal date passed.

In his letter, Stiffler claimed that Optymyze Singapore had applied the $926,924 that Connection paid under the Proposed Agreement as a credit against the $1.8 million annual fee that he now claimed was due. The Stiffler Organization now concedes that Optymyze Singapore transferred the $926,924 to Synygy Singapore. *See* Dkt. 58 ("Dallaire Aff.") Ex. 14, Resp. to Pl.'s Interrog. No. 13.

## K.     The Stiffler Organization Threatens To Cut Off Services.

Just two days after demanding that Connection pay $5.4 million, the Stiffler Organization threatened to cut off Connection's access to the Compensation Platform. On September 17, 2020, the Stiffler Organization caused login notices to appear on the Compensation Platform which stated that Connection's rights to use the platform had

19

expired. The notices stated that after a "grace period," Connection's access to the Compensation Platform would be shut off. *See* Murrah Decl., Ex. W at '245.

On September 24, 2020, Connection received an email from Amit Gupta "[o]n Behalf of Mark Stiffler." *Id.* '242. The email included a document titled "Synopsis of Events," which asserted that the 2017 SOW expired in June 2020 and that Connection had "no agreement with any party at this time." *Id.* at '243–45. Many of the descriptions in the synopsis appear contrived to support Stiffler's retroactive characterization of events. For example, the synopsis claimed that the 2017 SOW "was never assigned to [Optymyze Singapore]" and that the contract instead was assigned to Synygy Singapore "effective 2018." *Id.* at '243. Yet despite taking these positions, the synopsis asserted that Optymyze Singapore (rather than Synygy Singapore) had granted Connection "a grace period through September 30, 2020." *Id.* at '245.

On September 29, 2020, Connection received another email from Gupta "on behalf of Mark Stiffler." *Id.*, Ex. X at '220. The email alleged that the Stiffler Organization had provided Connection "seven days notice of suspension" pursuant to Section 12.3 of the 2013 Master Agreement. *Id.* The email claimed that as a result, the Stiffler Organization could suspend Connection's services. *Id.*

## L.    This Litigation

Faced with the Stiffler Organization's threat, Connection filed this lawsuit on October 9, 2020. Connection's complaint contains nine counts:

- Count I seeks an injunction preventing the Stiffler Organization from suspending service.

- Count II seeks a declaration that the 2017 SOW was not terminated and renewed for two years on April 1, 2020.

- Count III seeks a declaration that an implied contract has existed between Connection and the Stiffler Organization since June 29, 2019, that is consistent with the terms of the 2013 SOW.

- Count IV seeks an award of the costs, expenses, and attorneys' fees that Connection incurred in bringing this action.

- Count V asserts that the Stiffler Organization breached the 2013 Master Agreement, the 2013 SOW, and the 2017 SOW by assessing the overage fees.

- Count VI asserts that the Stiffler Organization's refusal to continue providing services was an anticipatory repudiation and thus a breach of the 2013 Master Agreement, the 2013 SOW, and the 2017 SOW.

- Count VII asserts that the Stiffler Organization breached the implied covenant of good faith and fair dealing that inheres in the 2013 Master Agreement, the 2013 SOW, and the 2017 SOW by exploiting Connection's need for the Compensation Platform in an attempt to extract more onerous terms in a new agreement.

- Count VIII asserts that the Stiffler Organization wrongfully converted Connection's funds by applying Connection's $926,924 payment against the $1.8 million fee that Stiffler claims to be owed.

- Count IX asserts a claim for violation of the Delaware Uniform Deceptive Trade Practices Act.

Connection moved for expedited proceedings and for an order maintaining the status quo pending the court's ruling on Connection's request for a preliminary injunction. The parties agreed to a status quo order and an expedited schedule.

**M. The Notice Of Breach**

On October 16, 2020, the Stiffler Organization caused Yeo to send a letter to Connection with the subject line "Notice of Material Breach of 2017 SOW." Murrah Decl. Ex. Y (the "Notice of Breach"). The Notice of Breach implicitly conceded that the 2017 SOW was still in force, contradicting the Stiffler Organization's prior claim that the 2017

21

SOW expired in June 2020. In discovery, the Stiffler Organization admitted that the 2017 SOW renewed on April 1, 2020, for an additional two-year term. Dkt. 59 Ex. E, Def.'s Resp. to Pl.'s Interrog. No. 2.

The Notice of Breach contained a series of gratuitous and dubious assertions about the Stiffler Organization, such as a claim that Original Synygy and New Synygy were "unrelated part[ies]." Notice of Breach at 2 n.2. The Notice of Breach also claimed:

> Upon my information and belief, [Original Synygy] was one of the first companies, in 2013, to enter into a reseller agreement with [Optymyze Singapore], a startup company that was in the process of creating [the Compensation Platform], which was not released until 2015, but which pre-release versions of [sic] were being used by service partners, including [Original Synygy], for testing and initial rollout.

*Id.* n.3. The Notice of Breach labeled the Compensation Platform "third-party Optymyze software," a reference which sought to distance Synygy Singapore from its sister Stiffler Organization entities in this litigation. *Id.* at 1. There is no evidence in the record to support these assertions, which are inconsistent with the 2013 Master Agreement and the 2013 SOW.

In the Notice of Breach, the Stiffler Organization claimed that Connection had breached the 2017 SOW by "manag[ing] the sales commission plans for 241 MoreDirect participants and other 1000 other participants," creating "30 types of custom end-user apps," and giving "1350 users access to those apps." *Id.* The Notice of Breach asserted that Connection had been "expressly informed over two years ago" that these alleged breaches were occurring. *Id.* There is no evidence that the Stiffler Organization informed Connection of its alleged breaches of the 2017 SOW prior to October 16, 2020. The reference to prior

22

communications may have sought to sweep in discussions over the 2018 Proposal, which recited that Connection had exceeded the participant cap in the *2013* SOW. Those communications did not address the 2017 SOW.

The Notice of Breach also claimed that the 2013 SOW had lapsed and that even if the 2013 SOW were still in effect, Connection had breached it materially "by exceeding the limitations set forth in Exhibits A and B of the 2013 SOW" and "by extensively modifying the Optymyze software." *Id.* at 2. The Stiffler Organization claimed that if Connection did not cure its alleged material breaches by November 15, 2020, then all services would cease on November 21, 2020. *Id.* at 3.

**N.      The Stiffler Organization's Refusal To Participate In Discovery**

During the injunction phase of this litigation, the Stiffler Organization used its shuffling of entities to obstruct Connection's ability to conduct discovery. Of the six named defendants, only Synygy Singapore has participated in this litigation. The other extant entities have refused to participate, and Synygy Singapore has declined to provide the discovery that would enable Connection to test the Stiffler Organization's assertions about its relationships with the other defendants. *See* Dallaire Aff. Ex. 14, Resp. to Pl.'s Interrog. No. 10. Synygy Singapore also refused to explain Stiffler's relationship to the various defendants. *See id.*, Resp. to Pl.'s Interrog. No. 11.

Because the remaining defendants were failing to participate in this litigation, Connection moved to compel their participation. Dkt. 39. In response, the Stiffler Organization claimed that Synygy Singapore is the only proper defendant because it is "the owner and counterparty to the contracts that are the subject of Plaintiff's expedited claim."

23

Dkt. 40 ¶ 3; *see* Countercl. ¶ 5. The Stiffler Organization claimed that Original Synygy is a "defunct entity" that transferred all of its assets to Original Optymyze in 2017, that both Original Synygy and New Synygy ceased to exist in 2017, and that Original Optymyze ceased to exist in 2018. Dkt. 40 ¶ 4. The Stiffler Organization claimed that Optymyze Singapore is a "cloud services company" that "is not a counterparty to the disputed contracts (which are professional services contracts), and does not consent to jurisdiction" in this court. *Id.* Stiffler also did not consent to jurisdiction in this court. *Id.*

There is reason to believe that the Stiffler Organization's refusal to participate in discovery has resulted in Connection being denied responsive information regarding the entities it has interacted with throughout most of its relationship with the Stiffler Organization. *See, e.g.*, *id.* ¶ 2. Among other things, Stiffler refused to sit for a deposition, and Optymyze Singapore refused to produce a Rule 30(b)(6) witness and would not allow a witness from Synygy Singapore to testify on its behalf. *See* Dkt. 62 Ex. 1; Dkt. 59 Ex. A. Based on the Stiffler Organization's refusal to participate meaningfully in discovery, Connection decided to forego conducting depositions, reasonably concluding that it would be a useless exercise. *See* Dkt. 56 at 8; Dkt. 59, Ex. A at 1.

## O.     The Stiffler Organization Cuts Off Services.

The court held a hearing on Connection's application for a preliminary injunction on November 20, 2020. Dkt. 67. At the conclusion of the hearing, the court reminded the parties that the status quo remained in effect pending the court's ruling. Dkt. 67 at 53.

The Stiffler Organization did not respect the status quo order. On Christmas Eve, while the matter remained under submission, the Stiffler Organization terminated access

to the Compensation Platform. Connection filed an emergency motion to enforce the status quo order. Dkt. 72.

Cutting off of services facially violated the status quo order, and the Stiffler Organization did not argue otherwise. As its only defense, the Stiffler Organization asserted that Synygy Singapore lacked the power to provide the services and that unrelated suppliers had made the decision to cut them off. Dkt. 73 at 2–4; *see* Dkt. 74; Dkt. 75. According to the Stiffler Organization, Connection's access was revoked by Arrezo Sky, an entity located in India "that neither [Synygy Singapore] not [sic] [Optymyze Singapore] owns or controls." Dkt. 74 ¶ 8. That carefully worded statement preserved the possibility that Synygy Singapore, Optymyze Singapore, and Arrezo Sky are all under Stiffler's control. At the hearing on Connection's emergency motion, counsel for the Stiffler Organization could not explain how Arrezo Sky came to control Connection's access to the Compensation Platform. The Stiffler Organization had previously represented that Synygy Singapore had the ability to deliver the Compensation Platform, which was the premise for Synygy Singapore's claim that it was the sole relevant defendant.

The Stiffler Organization's vague explanations were insufficient to avoid a finding of contempt. The court imposed a coercive sanction of $50,000 per day on the Stiffler Organization until Connection's access to the Compensation Platform is restored. Dkt. 76. ¶ 3.

## II.    LEGAL ANALYSIS

To obtain a preliminary injunction, the movant must demonstrate (i) a reasonable probability of success on the merits, (ii) a threat of irreparable harm if an injunction is not

25

granted, and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Co.*, 506 A.2d 173, 179 (Del. 1986). "The elements are not necessarily weighted equally. A strong showing on one element may overcome a weak showing on another element. However, a failure of proof on one of the elements will defeat the application." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

## A. The Probability Of Success On The Merits

To establish a probability of success on the merits, Connection relies primarily on three theories. First, Connection claims that terminating its access to the Compensation Platform would violate the 2013 SOW. Second, Connection claims that terminating its access to the Compensation Platform would violate an implied contract created in 2019 after the 2013 SOW expired by its terms. Third, Connection claims that terminating its access to the Compensation Platform would violate the 2017 SOW. Dkt. 56 at 27–28. Connection also advanced other theories, which this decision does not reach.

### 1. The 2013 SOW

Under its first theory, Connection claims that terminating its access to the Compensation Platform would violate the 2013 SOW. Whether Connection has a reasonable likelihood of success on this claim depends on whether the Non-Renewal Notice was effective. The Stiffler Organization caused Optymyze Singapore to send Connection the Non-Renewal Notice on March 28, 2019. The problem for the defendants is that they have claimed in this litigation that when the letter was sent, Optymyze Singapore did not have any rights or obligations under the relevant agreements. According

26

to their position in this litigation, Optymyze Singapore was a stranger to the Stiffler Organization's contracts with Connection at the time. Complicating matters further, the Stiffler Organization restricted Connection's ability to conduct discovery to assess the validity of the Non-Renewal Notice. Under the circumstances, it would be inequitable to permit the Stiffler Organization to claim that the Non-Renewal Notice was valid.

The 2013 Master Agreement and its associated statements of work constitute an agreement governed by Delaware law. When interpreting such a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). If a contract's terms are ambiguous, "a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997).

The 2013 SOW had an initial term of five years beginning on June 30, 2013. After the initial term, the 2013 SOW would renew "automatically [from] year-to-year for an additional one (1) year term unless terminated by either party by providing at least ninety (90) days advance written notice to the other party before the expiration of the [current] term." 2013 SOW § 6.1.

Through the Non-Renewal Notice, Stiffler purported to give notice that Optymyze Singapore would not renew the 2013 SOW. The Non-Renewal Notice was delivered on March 28, 2019, more than ninety days before the 2013 SOW would have expired on June

27

30, 2019. If validly authorized, then the Non-Renewal Notice would have caused the 2013 SOW to terminate on June 30, 2019.

Unfortunately for the defendants, the Stiffler Organization has maintained in this litigation that Synygy Singapore held all of the rights under the 2013 Master Agreement and associated statements of work beginning on January 1, 2018. According to the Stiffler Organization, the Non-Renewal Notice was sent by a stranger to the contract. Connection contends that the Stiffler Organization cannot abjure that position for purposes of the injunction application. According to Connection, therefore, the Non-Renewal Notice was not authorized, the 2013 SOW renewed automatically on June 30, 2019, and again on June 30, 2020, and the 2013 SOW will remain in force at least until June 30, 2021.

Evaluating the parties' competing positions requires tracing the status of the 2013 Master Agreement and associated statements of work through four purported transfers. At each stage, the Stiffler Organization claims to have assigned the contractual rights under the 2013 Master Agreement and associated statements of work from one entity to another.

Although parties like the Stiffler Organization may speak colloquially about "assigning" a contract, that informal usage elides the distinct concepts of contractual rights and duties. A party to a contract has both the right to receive performance from its counterparty and the duty to render its own performance to its counterparty. Contractual "rights are said to be 'assigned'; duties are said to be 'delegated.'" *Restatement (Second)*

28

*of Contracts* § 316 cmt. c (1981). In general, contractual rights are freely assignable.[3] By contrast, "[a] person subject to a duty (the obligor) does not ordinarily have such a power to substitute another in his place without the consent of the obligee; this is what is meant when it is said that duties cannot be assigned." *Restatement*, *supra*, § 316 cmt. c; *see id.*, § 328 cmt. a ("A duty cannot be 'assigned' in the sense in which 'assignment' is used in this Chapter.").

"'Delegation' of performance *may* be effective to empower a substitute to perform on behalf of the obligor, but the obligor remains subject to the duty until it has been discharged by performance or otherwise." *Id.* § 316 (emphasis added). "Unless the obligee agrees otherwise, neither delegation of performance, nor a contract to assume the duty discharges any duty or liability of the delegator-obligor." *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 370 (Del. 2009) (citing *Restatement*, *supra*, § 318(3)); *accord AT &T Corp. v. Clarendon Am. Ins. Co.*, 931 A.2d 409, 417 n.17 (Del. 2007) (applying California law). "An obligor is discharged by the substitution of a new obligor only if the contract so provides or if the obligee makes a binding manifestation of assent, forming a

---

[3] *See, e.g.*, *Grynberg v. Burke*, 1981 WL 15118, at *1 (Del. Ch. May 20, 1981) ("The general rule is that a contract not involving personal trust and confidence, and not being for personal services, is assignable in the absence of language to the contrary."); *Restatement*, *supra*, § 317(2) (explaining that a contractual right can be assigned unless the assignment "would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or . . . the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or . . . assignment is validly precluded by contract").

novation." *Crystal Props.*, 986 A.2d at 370 n.23 (citing *Restatement*, *supra*, § 318 cmt. d.). This is true even if "the obligor manifests an intention to substitute another obligor in his place and the other purports to assume the duty." *Id.* Unless there is a novation, the original obligor remains liable under the contract and stands as a surety for the performance of the party to whom the delegation was made. *Id.* at 370; *accord Schwartz v. Centennial Ins. Co.*, 1980 WL 77940, at *3 (Del. Ch. Jan. 16, 1980) ("It is clear that a party cannot escape his duties under a contract by assigning the contract to another. Normally, an assignor remains liable as a surety for performance under an assigned contract: he must indemnify the [obligee] for the acts or omissions of the assignee.").

A party who has delegated a contractual obligation may be subject to a claim for repudiation if the party disclaims its ongoing obligation as a surety or renders itself unable to perform that obligation. "A repudiation is (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach . . . or (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Restatement*, *supra*, § 250. "In order for a statement or an act to be a repudiation, the threatened breach must be of sufficient gravity that, if the breach actually occurred, it would of itself give the obligee a claim for damages for total breach" by nonperformance. *Id.* cmt. d. If a party repudiates its obligations under a contract, the "repudiation alone gives rise to a claim for damages for total breach," even if the party has not yet breached the contract by failing to perform. *Id.* § 253(1).

### a. The 2015 Transfer To New Synygy

The first assignment of rights and delegation of duties under the 2013 Master Agreement and associated statements of work took place in 2015, when the Stiffler Organization caused Original Synygy to transfer its rights and obligations to New Synygy. Answer ¶ 10. As a result of the delegation, New Synygy became obligated to perform under the 2013 Master Agreement and associated statements of work, and Original Synygy continued to be obligated to perform as a surety for New Synygy.

The Stiffler Organization did not inform Connection about the delegation until 2017, while the parties were negotiating the 2017 SOW. At that point, the Stiffler Organization claimed that New Synygy was the successor in interest to Original Synygy. Based on this representation, Connection and New Synygy signed the 2017 SOW.

It is possible that as a result of these events, a novation occurred that properly substituted New Synygy for Original Synygy. It also is possible that if a novation did not occur, then Original Synygy repudiated its obligations to Connection when it dissolved in 2017. By dissolving and ceasing to exist, Original Synygy engaged in "a voluntary affirmative act which renders the obligor unable . . . to perform" under its agreement. *See Restatement*, *supra*, § 250. Connection appears to regard Original Synygy as liable under the 2013 Master Agreement and associated statements of work, because Connection has named Original Synygy as a defendant.

### b. The 2017 Transfer To Original Optymyze

The second assignment of rights and delegation of duties under the 2013 Master Agreement and associated statements of work took place by operation of law when New

Synygy merged with and into Original Optymyze on September 28, 2017. *See* Yeo Decl.

¶ 5. Under Section 18-209 of the Delaware Limited Liability Company Act, two Delaware

limited liability companies can merge with the following effects:

> When any merger or consolidation shall have become effective under this section, for all purposes of the laws of the State of Delaware, all of the rights, privileges and powers of each of the domestic limited liability companies and other business entities that have merged or consolidated, and all property, real, personal and mixed, and all debts due to any of said domestic limited liability companies and other business entities, as well as all other things and causes of action belonging to each of such domestic limited liability companies and other business entities, shall be vested in the surviving or resulting domestic limited liability company or other business entity, and shall thereafter be the property of the surviving or resulting domestic limited liability company or other business entity as they were of each of the domestic limited liability companies and other business entities that have merged or consolidated, and the title to any real property vested by deed or otherwise, under the laws of the State of Delaware, in any of such domestic limited liability companies and other business entities, shall not revert or be in any way impaired by reason of this chapter; but all rights of creditors and all liens upon any property of any of said domestic limited liability companies and other business entities shall be preserved unimpaired, and all debts, liabilities and duties of each of the said domestic limited liability companies and other business entities that have merged or consolidated shall thenceforth attach to the surviving or resulting domestic limited liability company or other business entity, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

6 *Del. C.* § 18-209(g).

Assuming that New Synygy and Original Optymyze validly merged, then New

Synygy's existence as a separate entity ceased. As a result of the merger, any contractual

rights and obligations that New Synygy possessed under the 2013 Master Agreement and

associated statements of work survived as contractual rights and obligations of Original

Optymyze.

32

### c. The 2018 Transfer To Optymyze Singapore

The third assignment of rights and delegation of duties under the 2013 Master Agreement and associated statements of work took place on June 5, 2018. On that date, the Stiffler Organization informed Connection that Original Optymyze had transferred the 2013 Master Agreement and associated statements of work to Optymyze Singapore. The Stiffler Organization claimed that the transfer was effective as of January 1, 2018. Murrah Decl. Ex. A.

Through this notice, Original Optymyze delegated its contractual obligations to Optymyze Singapore, and Optymyze Singapore became obligated to perform under the 2013 Master Agreement and associated statements of work. Original Optymyze continued to be obligated to perform as a surety for Optymyze Singapore.

It is possible that as a result of events in 2018, a novation occurred that properly substituted Optymyze Singapore for Original Optymyze. Connection did not object to the transfer, subsequently communicated with Optymyze Singapore, and sent payments to Optymyze Singapore. The record on Connection's acceptance is cloudy, however, because the Stiffler Organization often used the name "Optymyze" without referring specifically to Optymyze Singapore. Moreover, when dealing with Optymyze Singapore specifically, Connection frequently was addressing payment issues, and Original Optymyze could freely assign its right to receive payment from Connection to Optymyze Singapore. The fate of contractual obligations is a different issue, and Connection's communications regarding payment issues may not be sufficient to give rise to a novation regarding the contractual obligations of Original Optymyze. That possibility is particularly acute given

33

that Original Optymyze purported to delegate its obligations to Optymyze Singapore, a foreign corporation whose status limited Connection's ability to enforce its rights.

It is possible that if a novation did not occur, then Original Optymyze repudiated its obligations under the agreements with Connection when its certificate of formation was canceled on December 31, 2018. By dissolving and ceasing to exist, Original Optymyze engaged in "a voluntary affirmative act which renders the obligor unable . . . to perform" under its agreement. *See Restatement*, *supra*, § 250. Connection appears to continue to regard Original Optymyze as liable under the 2013 Master Agreement and associated statements of work, because Connection has named Original Optymyze as a defendant. Regardless, it is likely that after January 1, 2018, Original Optymyze became obligated to fulfill the contractual duties imposed by the 2013 Master Agreement and associated statements of work.

### d. The 2020 Transfer To Synygy Singapore

The final assignment of rights and delegation of duties took place as a result of the Stiffler Organization claiming it had been mistaken about Original Optymyze transferring the 2013 Master Agreement and associated statements of work to Optymyze Singapore. Instead, the Stiffler Organization claimed that Original Optymyze had transferred the 2013 Master Agreement and associated statements of work to Synygy Singapore. The Stiffler Organization claimed that the transfer to Synygy Singapore was effective as of January 1, 2018. Murrah Decl., Ex. F at '335.

The Stiffler Organization thus presented two inconsistent accounts of what happened to the 2013 Master Agreement and associated statements of work as of January

34

1, 2018. For over a year, the Stiffler Organization maintained that Optymyze Singapore took over those agreements. Then, one month before the filing of this litigation, the Stiffler Organization changed course and asserted that Synygy Singapore took over those agreements.

For purposes of any eventual adjudication of contractual rights and responsibilities, the Stiffler Organization's competing accounts present a host of factual and legal complexities. Given that Original Optymyze arguably delegated its responsibilities to both Optymyze Singapore and Synygy Singapore, it is possible that both could be liable for any failure to perform. It is also possible that by changing position, the Stiffler Organization caused Optymyze Singapore to repudiate its obligations under the 2013 Master Agreement and associated statements of work. Or the evidence may show that Original Optymyze delegated its obligations to Optymyze Singapore, which then effectively delegated those obligations to Synygy Singapore. Absent a novation, for which there currently is no evidence, the delegation of contractual duties to Synygy Singapore would not have eliminated the contractual responsibilities of any of its contractual predecessors. *See Crystal Props.*, 986 A.2d at 370; *Clarendon*, 931 A.2d at 417 n.17.

For present purposes, the operative question is not which entities ultimately might be subject to liability for a breach of contract, but rather whether the Non-Renewal Notice was authorized validly. On this issue, the Stiffler Organization's most recent positions are dispositive.

- According to the Stiffler Organization, Synygy Singapore has been the sole "owner and counterparty to the contracts that are the subject of Plaintiff's expedited claim" since January 1, 2018. Dkt. 40 ¶ 3.

35

- Optymyze Singapore "is not a counterparty to the disputed contracts." Dkt. 40 ¶ 4.

In addition to these clear statements, the Stiffler Organization took positions in discovery that prevented Connection from exploring which entities in the Stiffler Organization are its proper contractual counterparties.

- No defendants other than Synygy Singapore provided responses to Connection's discovery requests. *See* Dkt. 39 Ex. 1.

- In its responses, Synygy Singapore refused to produce information in the possession of Stiffler, Optymyze Singapore, or any of the other defendants. *Id.*

- Beginning on October 22, 2020, defense counsel took the position that they only represented Synygy Singapore and did not represent any of the other defendants. *See* Dkt. 39 at 5; Dkt. 51 at 18, 20–21. Defense counsel took this position despite having appeared on behalf of all defendants and agreed to a stipulated scheduling order on behalf of all defendants. *See* Dkt. 51 at 22.

- The Stiffler Organization refused to permit discovery into Stiffler's role on behalf of any of the entities. *See* Dallaire Aff. Ex. 14, Resp. to Pl.'s Interrog. No. 11.

- The Stiffler Organization refused to produce Stiffler for a deposition. *See* Dkt. 62 Ex. 1.

The Stiffler Organization's current position regarding Synygy Singapore means that when Stiffler sent the Non-Renewal Notice on behalf of Optymyze Singapore, that entity was a stranger to the contract and had no authority to take any position regarding it. Optymyze Singapore could no more issue a Non-Renewal Notice than any other third party.

Admittedly, it seems likely that by virtue of his ultimate control over the Stiffler Organization, Stiffler had the practical authority to cause any of his entities to issue the Non-Renewal Notice. At trial, that position may prevail. But given the stances that the Stiffler Organization has taken in this litigation to date, permitting Stiffler to rely on his

36

control over both Optymyze Singapore and Synygy Singapore would be inequitable. The defendants have consistently maintained that Synygy Singapore is the only proper party to this dispute and they have prevented Connection from obtaining discovery into the relationships among the various defendants and Stiffler himself.

For purposes of Connection's injunction application, Synygy Singapore is estopped from denying that it was the only party that could exercise the Stiffler Organization's rights under the 2013 Master Agreement and associated statements of work, including the right to issue a Non-Renewal Notice. Because the Non-Renewal Notice was not authorized, the 2013 SOW renewed automatically on June 29, 2019, and again on June 29, 2020. It will remain in effect at least until June 30, 2021.

## 2. The Claim For Breach Of The 2013 SOW

Because the proper contractual counterparty did not issue the Non-Renewal Notice, the 2013 SOW will remain in effect until at least June 30, 2021. Connection therefore has established a reasonable likelihood of success on the merits of its claim that the Stiffler Organization, including Synygy Singapore, would breach the 2013 SOW by suspending access to the Compensation Platform.

Under the 2013 SOW, the parties are obligated to fulfill their contractual obligations until the expiration of the agreement unless either party terminates the 2013 SOW "for cause upon 30 days written notice to the other party of a material breach of the Agreement or this Statement of Work if such breach remains uncured at the expiration of such 30-day period." 2013 SOW § 6.3. Absent a material breach by Connection, followed by notice

from the Stiffler Organization and an opportunity to cure, Connection is entitled to continue receiving services.

The Stiffler Organization contends that Connection has materially breached the 2013 SOW in multiple ways. First, the Stiffler Organization claims that Connection enabled 1,350 users to log into the Compensation Platform, violating a cap in the 2013 SOW that limited Connection to "700 Participants." Dkt. 58 at 12–13. Connection disputes the count of 1,350 users, but this claim fails in any event because Connection had the right to add additional participants. Exhibit C to the 2013 SOW provides that "[i]f the limitations on the number of Participant Users, Administrative Users, and Technical Users specified in Exhibit B to this Statement of Work are exceeded, You agree to pay for additional Software Services Subscription Fees according to the fees specified in the table below." 2013 SOW Ex. C. The 2013 SOW permits Connection to add additional participants as long as Connection pays the additional fees. For Connection to add participants was not a breach, much less a material breach.

The Stiffler Organization next claims that Connection breached the 2013 SOW by changing the Compensation Platform, including by

- Creating and maintaining custom end-user applications with more than 500,000 app pages available for use by 30 different types of users;

- Creating and modifying hundreds of custom data processing apps to analyze, transform, and feed sales comp apps – and nearly 100,000 app pages viewed per month; and

- Exporting data for use by other systems

Dkt. 58 at 12–13. These assertions fail because the 2013 SOW contemplates that "[t]he Technical Software Services for Technical Users includes the ability to . . . add or modify" numerous categories of data processes and data processing applications. 2013 SOW Ex. A. The 2013 SOW also permits Connection to "run jobs, including data load processes, data adjustment processes, data transformation processes, data export processes, compensation plan processes, report processes, and external processes (such as custom programs)." *Id.* This language appears to permit Connection to export highly processed data.

The Stiffler Organization also claims that Connection exceeded limitations on the amount of data storage it could use by

- Building a custom data repository with nearly 3,000 gigabytes of storage and hundreds of data tables, which exceeded the reference in Exhibit B of the 2013 SOW to "total disk storage up to 1,000 gigabytes of data," and

- Using the custom data apps to process 25 terabytes of data per month, which exceeded the reference in Exhibit B of the 2013 SOW to "1 gigabyte of input data per processing period."

Dkt. 58 at 13. The relevant language in the 2013 SOW states that the Stiffler Organization committed initially to "provide for a total of up to 1 gigabyte of input data per processing period." 2013 SOW Ex. B.

The language on data usage is ambiguous. It could be read as a limit on the amount of data storage that the Stiffler Organization would provide. It also could be read as a minimum commitment of data to support the initial number of users, with the understanding that the fee for additional users would cover the additional data storage that those users would require. The 2013 SOW does not identify a fee for data storage, supporting an inference that the cost of adding additional users to the system incorporated

39

the cost of providing additional data storage. It also is possible that the parties anticipated that the Stiffler Organization would be able to charge a fee for additional data usage. Because the 2013 SOW failed to specify an amount, the court will have to supply a reasonable fee. It is not credible that the parties regarded any additional data usage beyond the initial amount as a material breach by Connection, particularly when the 2013 SOW contemplated the possibility of additional users.

At this phase of the case, the record does not support the Stiffler Organization's contention that Connection materially breached the 2013 SOW. Absent a material breach, the Stiffler Organization is obligated to continue providing services through June 29, 2021. Suspending services would breach the 2013 SOW.

### 3. The Implied Contract

Assuming that the 2013 SOW did not renew on June 29, 2019, and again on June 29, 2020, the parties proceeded after June 29, 2019, under an implied contract with terms that largely paralleled the terms of the 2013 SOW. Authorities from other jurisdictions indicate that when parties continue to provide services after an agreement terminates, and when they have indicated that they intend for the commercial relationship to continue, then the law will imply the existence of an implied contract that parallels the terms of the prior contract. Delaware courts have not addressed whether such a contract incorporates the termination features of the prior contract or permits termination on reasonable notice. Assuming for the sake of argument that the Stiffler Organization can terminate on reasonable notice, then Connection is entitled to a sufficient notice period to enable Connection to transition its compensation platform to a different venture. Connection

40

accordingly has established a reasonable probability of success on the merits of its claim that the Stiffler Organization would breach the implied contract by terminating Connection's access to the Compensation Platform before a transition could take place.

### a. The Existence Of An Implied Contract

A contract "may be stated in words either oral or written, or may be inferred wholly or partly from conduct." *Restatement*, *supra*, § 4. An implied contract is "formed through the parties' conduct." *Chase Manhattan Bank v. Iridium Africa Corp.*, 239 F. Supp. 2d 402, 408 (D. Del. 2002); *accord Cap. Mgmt. Co. v. Brown*, 813 A.2d 1094, 1098 (Del. 2002) ("The parties' intent and mutual assent to an implied-in-fact contract is proved through conduct rather than words."). "The legal effect of [express and implied contracts] are identical; the distinction is based on the way in which mutual assent is manifested." 1 *Williston on Contracts* § 1:5 (4th ed. 1993); *accord Restatement*, *supra*, § 19 cmt. a.

"As a general rule, an implied agreement arises when a written contract expires by its terms and the parties continue to perform as before." *Cloverdale Equip. Co. v. Manitowoc Eng'g Co.*, 964 F. Supp. 1152, 1162 (E.D. Mich. 1997) (applying Michigan law); *accord Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*, 791 F. Supp. 401, 415 n.4 (S.D.N.Y. 1991) (applying New York law) ("The law is clear that even where an agreement expires by its terms, if the parties continue to perform as before, 'an implication arises that they have mutually assented to a new-contract containing the same provisions as the old.'" (quoting *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946), *cert. denied*, 329 U.S. 759 (1946))). After a contract expires, "one party's continued rendition of services" and "the other's acceptances of those services and payment in

41

accordance with the terms of the written contract can establish a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract." *FaZe Clan Inc. v. Tenney*, 467 F. Supp. 3d 180, 191 (S.D.N.Y. 2020) (applying New York law) (internal quotation marks omitted) (quoting *Andrews v. Sotheby Intern. Realty, Inc.*, 2014 WL 626968, at *8 (S.D.N.Y. Feb. 18, 2014)). "[T]his rationale loses some of its cogency in situations where the contract lapses because one party terminates it (rather than because the contract expires of its own force)," but it retains "most of its persuasiveness because the party's motive for terminating the contract in a continuing relationship will often be to change just a few of its terms." *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347, 356 (3d Cir. 1994).

Under these authorities, the record at this stage of the case makes it reasonably probable that the parties continued their relationship under an implied contract. The evidence indicates that the Stiffler Organization did not intend to terminate its relationship with Connection as of June 29, 2019. The Non-Renewal Notice stated that the Stiffler Organization's goal was to "enter into a more strategic relationship" with Connection. Murrah Decl. Ex. P. The Non-Renewal Notice also stated that the Stiffler Organization's goal was to enter into "new agreements to be effective upon the expiration of the [2013] SOW." *Id.* The Non-Renewal Notice also touted the Stiffler Organization's new service offerings. *Id.* Based on the Non-Renewal Notice, the Stiffler Organization was not trying to end the relationship, but rather to enter into "a continuing relationship" and "to change just a few of its terms." *Luden's*, 28 F.3d at 356.

42

After the non-renewal date passed, the Stiffler Organization continued to provide services as if nothing had changed. The Stiffler Organization continued to provide services for fourteen-and-a-half months, until September 15, 2020, without interruption and without making any threats about suspending service. During this period, Connection continued to use the services as it had before. A person of ordinary intelligence would infer from this course of conduct that both sides believed they had an agreement that permitted Connection to continue using the Stiffler Organization's services.

Consistent with the existence of an implied agreement, Stiffler sent a demand for payment on September 15, 2020, that relied on the rates established under the 2013 SOW. He also demanded payment for contractual overages based on his interpretation of the 2013 SOW. Stiffler himself thus understood that the parties continued to perform under an implied contract that paralleled the 2013 SOW.

### b. Whether Connection Breached The Implied Contract

The Stiffler Organization contends that even if an implied contract exists, then it terminated because Connection engaged in actions that would constitute material breaches of the 2013 SOW. To support this claim, the Stiffler Organization advances the same arguments that this decision already has rejected.

### c. The Stiffler Organization's Right To Terminate The Implied Contract

The Stiffler Organization maintains that even if an implied contract exists, then the Stiffler Organization can terminate it at will. According to the Stiffler Organization, cutting

off Connection's access to the Compensation Platform therefore would not breach the implied contract.

Courts in other jurisdictions have held that when an agreement expires by its terms and the parties continue to perform, then "an implication arises that they have mutually assented to a new-contract containing the same provisions as the old." *Ormesa*, 791 F. Supp. at 415 n.4 (internal quotation marks omitted) (quoting *Martin*, 156 F.2d at 129). The implied contract thus contains "substantially the same terms and conditions as embodied in the expired written contract." *FaZe Clan*, 467 F. Supp. 3d at 191; *accord Luden's*, 28 F.3d at 355–56 (applying federal law to implied-in-fact collective bargaining agreement).

No Delaware court has addressed whether the terms of the implied contract include the prior contract's termination provisions. If the implied contract included the same termination provisions as the 2013 SOW, then the implied contract would continue until June 29, 2021, unless the Stiffler Organization exercised a valid right to terminate for material breach.

Courts in other jurisdictions also have held that an implied contract results in "a contract having no definite duration [that] is terminable at will by either party upon reasonable notice to the other." *Ag-Chem Equip. Co., Inc. v. Hahn, Inc.*, 480 F.2d 482, 487 (8th Cir. 1973) (applying Minnesota law). Under this view, "termination of an implied contract is limited by a rule of reasonableness." *Roger Miller Music, Inc. v. Sony/ATV Publ'g LLC*, 2005 WL 8175111, at *3 (M.D. Tenn. Nov. 9, 2005) (applying Tennessee law).

What constitutes "reasonable notice" depends on the nature of the parties' agreement. When a party has made "a substantial investment" in reliance on an agreement, then the implied contract may extend the contract "for the length of time reasonably necessary for [the party] to recoup its investment plus reasonable termination notice." *Schultz v. Onan Corp.*, 737 F.2d 339, 346 (3d Cir. 1984) (applying Minnesota law to franchise agreement) (internal quotation marks omitted). "Reasonable notice is that period necessary to close out the [investment] and minimize losses." *McGinnis Piano & Organ Co. v. Yamaha Int'l Corp.*, 480 F.2d 474, 479 (8th Cir. 1973) (interpreting franchise agreement). These principles are well-developed in the law of franchise agreements, where the franchise dealer often has the right to terminate a franchise in a manner that may be disadvantageous to the party that operated the franchise in reliance on the contract. *See Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388, 391 (8th Cir. 1968) ("[W]here an exclusive franchise dealer under an implied contract, terminable on notice, has . . . invested his resources and credit in establishment of a costly distribution facility for the supplier's product, and the supplier thereafter unreasonably terminates the contract and dealership without giving the dealer an opportunity to recoup his investment, a claim may be stated."); *Gaines W. Harrison & Sons, Inc. v. J. I. Case Co.*, 180 F. Supp. 243, 246 (E.D.S.C. 1960) (explaining that under South Carolina law a reasonable notice period is "one sufficiently long before termination to allow [the plaintiff] to adapt its equipment for installation on a different make of tractor" from a new supplier).

Although this case does not involve a franchise relationship, the equities are similar in that Connection is dependent upon the Compensation Platform and exposed to the

45

possibility of a predatory termination by the Stiffler Organization. The record demonstrates that the Stiffler Organization understood that Connection was dependent on its product and attempted to use its resulting leverage to extract unfair terms from Connection.[4]

For purposes of this case, the rule that implies a reasonable notice period is sufficient to protect Connection and comparatively more favorable to the Stiffler Organization. A reasonable termination period would have to be sufficiently long to protect Connection against exploitation during its period of vulnerability before it can line up an alternative vendor. Connection has indicated that it likely can arrange for an alternative vendor by March 30, 2021. Under the rule that implies a reasonable notice period, therefore, the Stiffler Organization could terminate the implied contract earlier than it could if the court construed the implied contract to include the termination provisions in the 2013 SOW.

In the Notice of Termination sent on October 16, 2020, the Stiffler Organization proposed termination after thirty days. Connection has shown that it cannot secure an alternative vendor for a compensation platform within thirty days, so thirty days is not a reasonable notice period. Connection has established a reasonable likelihood of success on the merits of its claim that suspension of services after only thirty days would violate the parties' implied contract. Connection has further shown that it would violate the parties'

---

[4] The Stiffler Organization's similar behavior with another customer reinforces this interpretation of the record. *See Charter Commc'ns Op. LLC v. Optymyze, LLC*, C.A. No. 2018-0865-JTL, mem. op. (Del. Ch. Jan. 4, 2021).

implied contract for the Stiffler Organization to suspend services before Connection has a reasonable opportunity to secure an alternative vendor.

### 4. The Claim For Breach Of The 2017 SOW

Under its third theory, Connection asserts that the Stiffler Organization would violate the 2017 SOW if it suspended services. It is now undisputed that the 2017 SOW renewed on April 1, 2020, for an additional two-year term that will last until April 2, 2022. During that period, the 2017 SOW can be terminated only if a party gives notice of a material breach and the counterparty fails to cure within thirty days. In the Notice of Termination, the Stiffler Organization claims that Connection materially breached the 2017 SOW by permitting more than 175 MoreDirect participants to use the Compensation Platform. Dkt. 58 at 30–35. Connection established a reasonable probability of success on the merits of its claim that it has not materially breached the 2017 SOW and that for the Stiffler Organization to suspend services would violate the 2017 SOW.

Section 2.2 of the 2017 SOW provides that Connection will "comply with the limitations for Cloud Services described in Exhibit B." Exhibit B to the 2017 SOW states that the Stiffler Organization will provide Cloud Services "for up to 175 participants." The 2017 SOW does not state that this is a maximum number of users. Instead, Exhibit B states that "[i]f the Cloud Services requested by You exceed the scope of Cloud Services described above, then for an additional fee, and with adequate notice and upon Your approval, We will provide additional Cloud Services." 2017 SOW Ex. B.

The plain language of the 2017 SOW thus contemplates that Connection can obtain additional Cloud Services for MoreDirect—including for additional users—by paying

47

additional fees. The plain language of the 2017 SOW also incorporates all of the terms and conditions of the 2013 Master Agreement, including "any other addenda or Statements of Work . . . not modified by this SOW." 2017 SOW at 3. The 2017 SOW thus incorporates by reference the schedule for "Incremental Subscription Fees" in the 2013 SOW, and none of the 2017 SOW's provisions purport to modify that fee schedule.

Under the plain language of these provisions, Connection could add additional users for MoreDirect by paying the additional per-user fees set forth in the 2013 SOW. Connection did not materially breach the 2017 SOW by having more than 175 users for MoreDirect.

The parties' course of dealing confirms this interpretation. On April 19, 2018, an individual with the Stiffler Organization asked MoreDirect "to perform an assessment on the number of employees that need to be onboarded into the platform in the future. *There isn't a limitation*, but additional employees above the 175 number will generate additional cost." Dkt. 60 Ex. B (emphasis added). On the same day, another individual with the Stiffler Organization stated that "[a]s discussed in the call, the platform is flexible and can support more participants. Please contact us in case you'd need more to be added." *Id.* Ex. A.

Connection has established a reasonable likelihood of success on the merits of its claim that any suspension of services to MoreDirect would breach the 2017 SOW.

B.    Irreparable Harm

The second requirement for a preliminary injunction is for the plaintiff to demonstrate that it will suffer irreparable harm if the injunction is not granted. *Revlon*, 506 A.2d at 179. Irreparable harm does not exist when "[a]lternative legal redress [is] clearly

48

available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) (alteration in original) (footnotes and internal quotation marks omitted). "Irreparable injury exists when [damages] would involve speculation," such as harmed "reputation, goodwill, customer relationships, and employee morale." *In re Shawe & Elting LLC*, 2015 WL 4874733, at *28 (Del. Ch. Aug. 13, 2015) (internal quotation marks omitted), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

The Stiffler Organization does not contest the existence of a threat of irreparable harm. *See* Dkt. 67 at 22 (counsel for the Stiffler Organization stating "I don't think either party is really arguing the irreparable harm here"). That concession was prudent, because a threat of irreparable harm plainly exists.

Connection relies on the Compensation Platform to compensate its sales employees, who are responsible for generating revenue for Connection. If Connection cannot compensate its employees, then it risks losing those employees and impairing its relationships with its customers. Losing access to the Compensation Platform also would impair Connection's relationships with its suppliers, who provide promotional incentive funds that are used in the compensation plans for Connection's sales employees. Connection faces a threat of irreparable harm to its reputation, goodwill, customer relationships, and employee morale.

## C. Balancing Of Equities

The final element of the injunction standard is the balancing of equities:

[A] court must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a preliminary remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.

*Lennane v. ASK Comput. Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. Oct. 11, 1990) (Allen, C.). The equities favor Connection.

The preliminary relief that Connection seeks will preserve the status quo that has existed between the parties without interruption since 2013. An injunction will not create any new obligations for the Stiffler Organization. An injunction also will not require that the Stiffler Organization provide services without compensation. Connection ultimately will have to pay for the services it receives. Although determining that amount will require a trial, the Stiffler Organization will not be required to do anything that it has not been doing for the past seven years.

On the other side of the ledger, this decision has held that Connection is reasonably likely to prevail on the merits of its claim that suspending services would violate the 2013 SOW, an implied contract, and the 2017 SOW. Denying injunctive relief would permit the Stiffler Organization to engage in conduct that is likely to violate Connection's contract rights and inflict irreparable harm on its business.

The only other factor that is likely to change the balancing of hardships is Connection's ability to secure a new vendor and transfer its compensation plans to a new system. Once that has occurred, then the threat of irreparable harm that Connection faces will dissipate. Consequently, the preliminary injunction will not remain in place beyond

the time necessary for Connection to transfer to a new vendor. Connection estimates that the transition can be accomplished by March 31, 2021.

**D.      Bond**

Under Court of Chancery Rule 65(c), "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." "A party that is wrongfully enjoined may recover damages resulting from the injunction, but that recovery is limited to the amount of the bond." *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 469 (Del. 2010). The amount of an injunction bond must be based on the losses that can be proximately caused by a wrongful injunction. *See id.* at 470.

The Stiffler Organization estimates that Connection's use of its services will cause up to $7 million in damages. Dkt. 58 at 39–40. The Stiffler Organization did not provide any evidence to support this figure, which appears excessive.

The most likely outcome is that Connection will be obligated to pay for the Stiffler Organization's services at the rates it was paying under the 2013 SOW and the 2017 SOW, plus any overages that the Stiffler Organization proves at trial. Under the 2013 SOW and the 2017 SOW, Connection was paying an annual cost for services of less than $350,000.

On September 3, 2020, Connection made a payment of $926,924 to Optymyze Singapore, which the Stiffler Organization credited to Synygy Singapore. Dallaire Aff. Ex. 14, Def.'s Response to Pl.'s Interrog. No. 13. The Stiffler Organization declined to provide additional information about the payment, asserting that such information "is beyond the

51

limited scope of this preliminary injunction proceeding." *Id.*, Def.'s Response to Pl.'s Interrog. No. 14. The Stiffler Organization has not identified any reason to believe that the costs of a wrongful injunction would exceed $926,924. Because the Stiffler Organization is currently holding $926,924, Connection will not be ordered to post an additional amount as bond.

## III. CONCLUSION

Connection's request for a preliminary injunction is granted. The court's status quo order dated October 12, 2020, is converted into a preliminary injunction that will remain in place until the earlier of either the final disposition of this action or March 31, 2021, at which point Connection will have had a reasonable period to transition services and minimize potential losses from the termination of an implied contract. As contemplated by Rule 65(d), the preliminary injunction is binding on the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.